# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                               No. CR 13-0664 JB

JOSE ISRAEL VILLABA,

      Defendant.

## AMENDED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Suppress, filed June 11, 2013 (Doc. 24). The Court held a hearing on the Motion to Suppress on July 29, 2013. The primary issues are: (i) whether Defendant Jose Israel Villaba gave Drug Enforcement Administration ("DEA") Task Force Officer Johnathon Walsh consent to examine a toy truck that Villaba was carrying; and (ii) whether Walsh had reasonable suspicion sufficient to detain and examine the toy truck. The Court will deny the Motion to Suppress. Villaba consented to Walsh's request to remove the toy truck from its cardboard packaging, did not limit his consent, and did not object when Walsh turned the toy truck over to examine the truck's underside, and Villaba's consent was therefore broad enough to include Walsh's visual examination of the truck's underside. The Court also concludes that, alternatively, based on the totality of the

---

[1] This Amended Memorandum Opinion and Order replaces the Court's previous Memorandum Opinion and Order, filed August 21, 2013 (Doc. 51). The Court is amending its previous opinion to address an omission in that Memorandum Opinion and Order's footnote 8, at pages 32 and 33 -- inserting the word "not" into the sentence on page 33, which stated that "the Court is inclined to grant the Motion to Strike," so that it now reads: "While the Court is not inclined to grant the Motion to Strike, it will allow Villaba to argue his motion, file an additional response brief, and, if he feels it appropriate, ask the Court to reconsider its decision." This footnote and that typographical change are the only changes to the Memorandum Opinion and Order.

circumstances, at the time Walsh allegedly exceeded the scope of Villaba's consent by flipping over the toy truck, Walsh had reasonable suspicion to detain Villaba's toy truck, and to investigate the grounds for his suspicion -- that the truck contained narcotics -- by visually examining the truck's exterior.  Because Walsh's examination of the truck was lawful under either Villaba's consent or under Walsh's reasonable suspicion, and because Walsh developed probable cause when, during this visual examination, he saw a tape-wrapped bag that contained the narcotics, the incriminating nature of which was immediately apparent, Walsh's discovery of the narcotics falls under the plain-view exception to the warrant requirement.  That Walsh used a flashlight to view the bag through the truck does not affect the constitutionality of the search. Accordingly, the Court will not exclude the drug evidence from trial in this case.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record.").  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not

bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'");[3] United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to

---

[2] Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross examine the witness.  See 541 U.S. at 53-54.

[3] United States v. Garcia is an unpublished opinion, but the Court may rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court finds that United States v. Garcia and United States v. Green, 140 F. App'x 798, 800 (10th Cir. 2005)(unpublished), have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion and Order.

fourteen

the use of the confidential informant. The Supreme Court has not yet indicated whether the

Confrontation Clause applies to hearsay statements made in suppression hearings."). Cf. United

States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that

Crawford v. Washington does not apply to detention hearings").[4]

      1.     On the morning of February 21, 2013, Walsh and DEA Special Agent Jarrell

Perry were at the Albuquerque, New Mexico Greyhound Bus station to meet the eastbound

---

[4] Villaba does not object under Crawford v. Washington to any evidence in this case; the Court, therefore, need not decide whether Crawford v. Washington applies to suppression hearings. While Villaba raised a confrontation clause issue at the evidentiary hearing when Plaintiff United States of America began to ask Walsh about information that he allegedly obtained from a confidential source. See Transcript of Hearing at 86:4-15 (taken July 29, 2013)(Crow)("Tr.")(The Court's references to the transcript of the hearing refer to the court reporter's original, unedited version. Any citations to the official transcript may therefore contain slightly different page numbers and line numbers.). When Villaba raised this objection, the Court noted that, for the Court to decide whether it can rely on the information that any confidential source provided to Villaba would require the Court to decide whether Crawford v. Washington applies to suppression hearings -- an issue that "has [not] been determined by the Tenth Circuit." Tr. at 86:18-20 (Court). Rather than having the Court decide the issue, the parties agreed that the Court will not consider any of the testimony related to a confidential informant. See Tr. at 86:23-87:3, 87:13-13, 87:18-23 (Court, Mysliwiec, Crow). Accordingly, there are no issues related to Villaba's Confrontation Clause rights that the Court need decide in this case.

     The Court notes, however, that the courts that have decided the issue whether the Confrontation Clause applies to suppression hearings have found that Crawford v. Washington does not apply to suppression hearings. See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(right of confrontation does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x. 705, 708 (10th Cir. 2009)(unpublished)("There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings. To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia."). Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that Crawford v. Washington does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence."); United States v. Saneaux, 365 F. Supp. Brief 2d 493, 498 n.5 (S.D.N.Y. 2005)(concluding that Crawford v. Washington does not apply to determining whether a statement is admissible under the coconspirators hearsay exception: "[B]ecause the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial.").

Greyhound Bus that was scheduled to arrive.  See Tr. at 9:12-15 (Walsh)("[O]n the morning of the 21st myself and my partner . . . were at Greyhound [station.]"); Bus Station DVD at 10:19:50 (taken February 21, 2013)(United States' Hearing Exhibit 3);[5] Tr. at 33:25-34:5 (Court)(admitting United States' Hearing Exhibit 3 into evidence).

      2.      When the bus arrived, Walsh and Perry observed the passengers disembark.  See Tr. at 9:10-21 (Walsh)("[We were at the] station conducting consensual encounters of passengers that were both arriving and departing from Albuquerque.").

      3.      Walsh noticed Villaba step off the bus carrying a red New Mexico "Lobos" duffle bag.  See Tr. at 9:25-10:1 (Walsh)("Villaba deboarded the bus and was carrying a duffle bag. And in specific it was a red Lobos duffle."); Red University of New Mexico Lobos Duffle Bag (United States' Hearing Exhibit 1); Tr. at 18:19-20 (Court)(admitting United States' Exhibit 1 into evidence); Bus Station DVD at 10:19:44-19:47.

      4.      Walsh approached Villaba at the front of the station, identified himself as a police officer, politely asked to speak with Villaba, and Villaba consented.   See Tr. at 10:5-8 (Walsh)("As soon as he walked around to the front of the station, I walked up behind Villaba, identified myself, asked for and received permission to speak with Villaba and then engaged in conversation with Villaba."); Bus Station DVD at  10:19:47-19:51 (Walsh, Villaba).

      5.      Villaba responded to Walsh's question where Villaba began his trip by answering

---

[5] The Bus Station DVD is a compilation of three separate recordings: (i) Walsh's belt tape recording; (ii) Perry's belt tape recording; and (iii) a video recording that a security camera without sound-recording capabilities recorded at the bus station.  See Tr. at 6:6-23 (Mysliwiec). The United States explained that it "merged the two transcripts and then merged that joint audio transcript with the silent video . . . -- we took what used to be three recordings, two audio and one video, and made it just one recording that a DVD."  Tr. at 6:17-23 (Mysliwiec).  After Walsh authenticated the Bus Station DVD by testifying that it accurately reflected, to the best of his knowledge, the recordings, see Tr. at 31:15-32:9 (Mysliwiec, Walsh), the Court admitted it into evidence, see 33:23-34:1 (Court).

that he began his trip in Phoenix, Arizona.  See Tr. at 10:12-15 (Mysliwiec, Walsh)("Q.   So, what is one of the first things you found out from Mr. Villaba during that discussion?"   "A. That he was arriving here in Albuquerque and that he had arrived from Phoenix earlier that morning."); Bus Station DVD at 10:19:51-20:00 (Walsh, Villaba).

6.      Through his training and experience, Walsh had come to know Phoenix as a large source city for illegal narcotics.  See Tr. at 10:16-21 (Mysliwiec, Walsh)(Q.  "[I]s the fact that a person that you have just met arrived from Phoenix -- is that interesting to you in some way?" "A.  Yes, sir.  Not completely, but . . . .  [o]ne [thing] in specific is that Phoenix is a large source city for illegal narcotics.").

7.      Walsh, in his training and experience, also recognizes that people have legitimate reasons to travel to and from Phoenix, and that "not everybody coming in from Phoenix is a drug dealer."  Tr. at 38:6-11 (Crow, Walsh)("Q.  And you would agree with me that not everybody coming in from Phoenix is a drug dealer?"   "A.  Absolutely." "Q.  And you would agree that people have legit reasons to go to Phoenix?"   "A.   Yes, sir.  Absolutely.").

8.      Walsh asked if he could see his ticket, which Villaba produced, and which Walsh inspected and returned to Villaba.  See Tr. at 55:25-56:3 (Crow, Walsh)(Q.  "At what point did you give Mr. Villaba's train ticket back to him?"   "A.  At the beginning of the encounter, sir.  As soon as I looked at it, I handed it right back to him."); Bus Station DVD at  10:20:00-20: (Walsh, Villaba).

9.      Walsh asked Villaba how long he had spent in Phoenix.  See Tr. at 10:22-24 (Mysliwiec, Walsh)("Q.  And did you find out how long the defendant had been in Phoenix before coming to Albuquerque?"   "A.  Yes.  Through my conversation I did, sir."); Bus Station DVD at 10:20:20-20:23 (Walsh).

- 6 -

10.     Villaba responded: "Maybe four days."   Bus Station DVD at 10:20:23-20:26 (Walsh, Villaba).  See Tr. at 11:1-3 (Walsh) ("I believe he indicated to me three to four days, and then later in the conversation indicated it had possibly been five days.  So in sum, but not verbatim, three to five days.").

11.     When asked the purpose of his trip to Phoenix, Villaba replied that he had been "visiting a friend."  Bus Station DVD at 10:20:28-20:29 (Villaba).

12.     Walsh explained to Villaba that he and his partners work the busses for security purposes.  See Bus Station DVD at 10:20:31-20:36 (Walsh)("Just so you understand what we do, we work the buses for security purposes.").   See also Tr. at 57:7 (Walsh)(stating that he and Perry were working the bus for "[l]aw enforcement and/or security purposes.").

13.     Walsh and Perry were not there for security purposes that day; rather, they were there for law enforcement purposes.  See Tr. at 58:1-3 (Crow, Walsh)("Q.  Just to be clear, you were not there for security purposes that day?"   "A.   We were working for law enforcement purposes.").

14.     Walsh then asked if Villaba was traveling with any luggage, and Villaba stated that he only had one carry-on bag.  See Bus Station DVD at 10:20:36-20:41 (Walsh, Villaba).

15.     Walsh then restated his purpose and explained that people often use the bus system to move contraband across state lines.  See Bus Station DVD at 10:20:41-20:49 (Walsh).

16.     Walsh asked Villaba if he was carrying contraband, and Villaba stated that he was not carrying contraband.  See Bus Station DVD at 10:20:49-20:51 (Walsh, Villaba).

17.     Walsh asked Villaba if he would consent to a luggage search.  See Tr. at 11:5-7 (Mysliwiec, Walsh)("Q.  So after you [had] that brief conversation with Villaba did you ask him if you could search his bag?"   "A.  I did, sir."); Bus Station DVD at 10:20:51-20:53 (Walsh).

18.    Villaba answered that he would not consent to a luggage search.  See Tr. at 11:9 (Walsh)("He indicated that he did not want me to search his bag."); Bus Station DVD at 10:20:53-20:57 (Villaba, Walsh).

19.    Walsh noticed that Villaba had become visibly nervous:  He was shaking, swaying back and forth, and his eyes were darting side to side.  See Tr. at 29:16-22 (Mysliwiec, Walsh)(Q.   "[I]t sounds like originally he didn't want to consent to a search but then he voluntarily showed you what was inside.  What was his demeanor like while this conversation was going on?"  "A.  He was extremely nervous, very nervous.  I could -- I could hear his voice shuttering; his hands were shaking, his eyes were [darting] from side to side.").

20.    Walsh asked Villaba if he was alright, pointing out that he seemed nervous.  See Bus Station DVD at 10:20:57-21:03 (Walsh).

21.    Villaba responded: "Well, yeah, you know, you showed up to me or whatever," gesturing toward Walsh and Perry, who had recently approached and was standing a few feet away from Walsh and Villaba.  Bus Station DVD at  10:21:03-21:06 (Villaba).

22.    A large portion of the people Walsh approaches at the bus station, when he identifies himself as a law enforcement officer, appear nervous.  See Tr. at 53:22-54:3 (Crow, Walsh)("Q.   And tell me if you agree [with] this statement:  A large portion of the people that you approach are nervous."  "A.  Yes, sir."  "Q.   Especially when you identify yourself as law enforcement?"  "A.   Not all the time, but a lot of times, yes, sir.").

23.    Based on the totality of the circumstances that Walsh observed, he then asked if Villaba would allow a narcotics canine search of the bag.  See Tr. at 11:14-15 (Walsh)(stating that he asked Villaba "if you would grant consent for me to allow a narcotics K-9 to examine the

bag."); Tr. at 38:19-39:1 (Crow, Walsh);[6] Bus Station DVD at  10:21:06-21:11 (Walsh).

24.     Villaba denied the request and asked the purpose of Walsh's inquiry.  See Tr. at 11:17-18 (Walsh)("He stated that he did not [want a K-9 to search his bag] and then proceeded to ask me why we were, basically, talking to him."); Bus Station DVD at  10:21:11-14 (Villaba).

25.     Walsh told Villaba: "We talk to everybody that's getting off the bus, sir."  Tr. at 11:18-20 (Walsh)(explaining that, after Villaba asked why they were talking to him, "I explained our purpose for being at the station and what we do at the station.").  See Bus Station DVD at 10:21:14-21:20 (Walsh).

26.     Walsh continued to ask Villaba about his travel plans, and then Villaba, without further prompting or inquiry, opened his bag to show Walsh the contents.  See Tr. at 12:4-9 (Mysliwiec, Walsh)("A.  I continued talking to Mr. Villaba about his travel plans . . . , at which point in time Mr. Villaba walked over to a small ledge, . . . and placed his bag there and then opened the bag."  "Q.  And he did that without any further prompting or commands? You didn't command him to open the bag for you --"  "A.  Absolutely not, sir."); Bus Station DVD at 10:21:20-21:29 (Walsh, Villaba).

---

[6] When asked why Walsh requested a canine unit to examine Villaba's bag after Villaba had denied Walsh consent to search the bag, Walsh explained that his suspicion was based on the totality of the circumstances:

> Based on the totality of the circumstances to that point, sir, not only because of his -- the location that he was leaving, but also the location he was arriving to, the nervousness that Mr. Villaba presented, as well as him denying consent to search the bag at that point, then I proceeded with the investigation to ask permission to allow a narcotics K-9 to search the bag.

Tr. at 38:19-39:1 (Walsh).  When asked whether he had reasonable suspicion at the time he asked Villaba whether he would consent to a canine examining Villaba's bag, Walsh responded that he did not have reasonable suspicion and that he did not have probable cause.  See Tr. at 40:14-20 (Crow, Walsh).

27.     Villaba pointed out that he was carrying a toy fire truck, towels, and hygiene materials.  See Tr. at 12:16-18 (Walsh)("As soon as he opened the bag the thing that I could see most prevalent was a box containing a toy truck, as it was seated on top of other clothing and/or towel-type items."); Bus Station DVD at 10:21:29-21:39 (Villaba).

28.     Walsh observed that, given the length of time Villaba represented he had stayed in Phoenix, "[t]here was much less clothing" than he expected to see, assuming one change of clothes per day.  Tr. at 22:24-23:4 (Walsh)("There was much less clothing than[] what you would normally see for someone and you would assume that you would have a change of clothes per day . . . .  It did not appear as though . . . there was that amount of clothing in the bag, sir.").

29.     Walsh did not count the number of clothing items in the duffle bag.  See Tr. at 49:10-22 (Crow, Walsh)(Q.  "Did you . . . fumble through his shirts and jeans and shorts?"  A. "No, sir, I did not."  "Q.  Okay.  So you didn't actually count how many shirts he had?  Jeans? Shorts?"  "A.  No, sir, I did not specifically --"  "Q.  Socks?"  "A.  No, Sir.").

30.     The toy truck took up the majority of the bag's interior capacity.  See Tr. at 12:21-22 (Walsh)("It took up the majority of the capacity of the interior of the bag, sir.").

31.     The toy truck raised Walsh's suspicions, because, in his experience as a law enforcement officer, he and other officers have been involved in situations in which drug traffickers conceal their drugs in a variety of items, including toys.  See Tr. at 13:13-17 (Walsh)("Many times in not only cases that [I have] been involved with, but other officers both with the Albuquerque Police Department and the DEA and several other officers, many times encounter narcotics that are concealed in a wide variety of items, to include toys . . . ."); Tr. at 13:24-14:1 (Mysliwiec, Walsh) ("Q.  So when you saw that child's toy taking up the majority of the bag was that suspicious to you?"  "A.  Yes, sir.").

32.     Walsh asked Villaba where he had gotten the truck, and Villaba replied that he had bought it in Phoenix for his nephew's birthday.  See Tr. at 13:1-2 (Walsh)("[H]e indicated to me that he had purchased [the truck] for his nephew."); Bus Station DVD at 10:21:39-21:49 (Walsh, Villaba).

33.     Specifically, Villaba stated that he purchased the toy truck new at a Kmart store in Phoenix.  See Tr. at 17:2-6 (Walsh)("Villaba indicated to me in sum, but not verbatim, that he had purchased the toy truck in Phoenix from a Kmart, if my recollection is correct, and that he also had purchased it brand-new in order to provide to his nephew as a gift.").

34.     Walsh then asked Villaba if he could examine the toy truck, and Villaba consented.  See Tr. at 14:2-8 (Mysliwiec, Walsh)("Q.  So when he said he was just showing you what was in the bag he wasn't letting you search it by showing you the toy what -- what happened next, if you recall?"  "A.  At that point in time I asked him for permission to examine the toy truck, to remove the toy truck from the bag and examine it at which point in time he gave me consent to do so."); Bus Station DVD at 10:21:49-22:02 (Walsh, Villaba).

35.     Walsh received permission to take the toy truck out of Villaba's bag and began to examine it while Perry engaged Villaba in conversation.  See Tr. at 14:9-12 (Mysliwiec, Walsh) (Wash explaining that he then "remov[ed] the toy truck from the red lobos bag"); Bus Station DVD at 10:22:02-22:38 (Walsh, Villaba, Perry).

36.     During this visual examination, Walsh noticed that the cardboard packaging around the truck was worn and torn, with portions taped into place, and that the cardboard had lost the rigidity normally present in new packaging.  See Tr. at 14:22-25 (Walsh)("As I was looking at the packaging I could see that it was worn on the corners, it had been retaped, and it appear[ed] as though the cardboard packaging surrounding the truck on two separate sides had

been tampered with."); Tr. at 25:18-26:12 (Walsh);[7] Toy Truck (United States' Hearing Exhibit 2); Tr. at 20:18-19 (Court)(admitting United States' Hearing Exhibit 2 into evidence).

37.     There is folding and tearing in the cardboard, and the corners are frayed.  See United States' Hearing Exhibit 2.

38.     The tape affixed to the bottom and top of the cardboard is affixed to the cardboard box at angles and is inconsistent in placement with the tape on the other sides of the box.  See United States' Hearing Exhibit 2.

39.     There are wear marks on the corners of the box.  See United States' Hearing Exhibit 2.

40.     Additionally, he saw what seemed to be evidence of tampering where the zip ties holding the truck in place passed through the cardboard.  See Tr. at 23:12-18 (Walsh)(stating that there appeared to be new zip ties and that, "where this zip tie is attached to the bottom side of the

---

[7] Walsh described his observations during his initial examination at the train station about the wear and tear to the Toy Truck's packaging while using the Toy Truck exhibit as a demonstrative aide in his testimony as follows:

[I]f I may turn this around right here, as you start to examine the bag from the back, you can see that there's bowing in the . . . cardboard, and on these corners you can start to see that they're frayed.  And in specific, if you look here you can see that there's these kind of not very -- If I may?  When you receive something from a factory, most of the time it's very square, whether it be packaging or tape, where the tape is cut off very square and they're affixed in a very professional manner.  As you can see here, this tape is somewhat affixed to the bottom of the cardboard at angles, else it's been cut off at angles, it's inconsistent in where the tape is put at as compared to the other side of the box here, as well.  In addition to that, if you look here at the top of this box the same thing occurs.  The tape is inconsistent in where it's placed at and the amount of tape that's there, in addition to the wear marks that you marks that you can see at the corners of the truck where the tape is actually affixed at, which again raised my suspicion if Mr. Villaba purchased it brand-new in Phoenix.

Tr. at 25:18-26:12 (Walsh).

cardboard," upon his examination, it was not properly attached); Tr. at 24:7-25:9 (Mysliwiec,

Walsh) (explaining that the truck was zip-tied with black zip ties, whereas the trailer, which

looked like it had been sealed by factory, was secured with clear zip ties, and also explaining that

the holes in the cardboard through which the black ties went through appeared larger, indicating

tampering); United States' Hearing Exhibit 2.

      41.    When Walsh held the toy truck he noticed that it was unusually heavy.  See Tr. at

15:3-5 (Walsh)("I picked up the truck; I also noticed that it was unusually heavy, more so than

what a normal toy truck for a layperson would believe would weigh . . . .").

      42.    Walsh did not know the size of the batteries that the truck required to operate.

See Tr. at 41:17-19 (Crow, Walsh)("Q.  What kind of batteries does that truck take?"  "A.  I

don't know, sir.").

      43.    The toy truck requires six AA-size batteries to operate.  See Toy Truck; Tr. at

42:2-6 (Crow, Walsh)(reading from the directions that "[t]his unit requires three AA batteries

and 3 AA batteries for sign, which is included;" and when asked whether "that would be a total

of six batteries," Walsh responded: "That is correct, sir.").

      44.    The unusual wear and tear was consistent with tampering that Walsh and Perry

had seen in the past where smugglers used gifts and toys to hide narcotics.  See Tr. at 78:10-

79:18 (Mysliwiec, Walsh)(Walsh discussing wear and tear that he noticed when he was "doing

this examination" as things that caused him "to believe that the box had been tampered with

rather than simply wear and tear from being carried in the bag").

      45.    Walsh did not know whether the wear and tear occurred while the toy truck was

in the store, or if the toy had been returned to Kmart and then sold to Villaba.  See Tr. at 44:12-

25 (Crow, Walsh)(Walsh answering questions whether the toy truck's packaging could have

been tattered by children in the store or at a time before it was returned to the store in the affirmative).

46.     After his visual inspection of the truck and its packaging, Walsh asked Villaba if he recently bought the toy truck, and Villaba responded: "Yeah."  Bus Station DVD at 10:22:34-22:37 (Walsh, Villaba).

47.     Walsh then asked Villaba if he would give Walsh consent to "open th[e] box to take a look at the truck."  Bus Station DVD at 10:22:38-22:43 (Walsh).  See Tr. at 15:5-7 (Walsh)("I asked Mr. Villaba for permission to remove the truck from its packaging.");

48.     Villaba said that he did not want Walsh to remove the truck from the packaging, because he was going to gift wrap the toy later.  See Tr. at 15:9-11 (Walsh)("He indicated that he did not want me to remove the truck from the packaging because he was going to gift wrap -- later gift wrap the actual toy."); Bus Station DVD at  10:22:43-22:49 (Villaba).

49.     Walsh told Villaba that would do as minimal damage as possible to the packaging as he removed the truck from the packaging, and asked again if he could remove the truck from the packaging.  See Tr. at 15:16-19 (Walsh)("I asked him again for permission to remove the truck and assured him that I would do as minimal damage as possible to the packaging as I removed the truck from the packaging."); Bus Station DVD at  10:22:49-22:58 (Walsh).

50.     Villaba then granted Walsh permission, stating: "Sure."  Bus Station DVD at 10:22:58-22:59 (Villaba).

51.     Specifically, the conversation between Walsh and Villaba went as follows:

Q.     Sir, would you give me consent to open this box and take a look at the truck?

A.     What do you mean?

Q.     May I open the box and take it out of its packaging to look at the truck?

A.     Unfortunately not because I was gonna wrap it.

Q.     You were gonna wrap it later?

A.     Yeah.

Q.     Okay, If you're gonna wrap it up later, would you give me consent to take it out, and you can put it back in?  If I take it out of the box, I assure you I will do as minimal damage to the box as possible.

A.     Sure.

Q.     I may take it out of the box?

A.     Uh-huh.

Bus Station DVD at 10:22:40-23:01 (Walsh, Villaba).

52.     Villaba's undivided attention was on Walsh during this particular part of the encounter.  See Bus Station DVD at 10:22:40-23:01 (Walsh, Villaba).

53.     Walsh then removed the truck from the packaging, turned the truck over, and "immediately noticed" that someone had tampered with the screws that hold on the bottom-side panel of the toy truck, as the screws had marks on them indicating that they had come into contact with a tool.  Tr. at 16:8-15 (Walsh)("I flipped the truck over, and one of the things I immediately noticed was that screws that hold in the bottom side of the panel of the toy truck had appeared as though they had been tampered with or that they had tooling marks on it . . . .").  See Bus Station DVD at 10:22:59-23:25:17.

54.     While Walsh was removing the truck from the packaging, Perry asked Villaba how much he paid for the toy truck at Kmart, and Villaba responded that he paid $10.00 for the truck.  See Bus Station DVD at 10:25:17-25:28 (Perry, Villaba).

55.     When Perry asked whether $10.00 was a good deal for the toy truck, Villaba

- 15 -

responded: "Yeah. I didn't have much money, so . . . ."  Bus Station DVD at 10:25:28-25:34 (Perry, Villaba).

56.     Walsh used his flashlight to observe the tool marks on the screws.  <u>See</u> Tr. at 47:3-7 (Crow, Walsh)(Q. "[D]id you have a flashlight with you?"  "A.  I did, sir."  "Q.  Okay. Did you use that to inspect the screws?"  "A.  I did, sir."); Bus Station DVD at  10:25:40-25:52.

57.     While visually inspecting the bottom of the toy truck, Walsh also saw, through the vents which allow the sound to exit the truck, "white plastic-type packaging" and "[w]hite tape, masking tape-type wrapping."  Tr. at 16:16-20, 55:7-8  (Walsh).

58.     Based on his training and experience, Walsh knew that this packaging "is consistent with illegal narcotics."  Tr. at 16:20-21 (Walsh).

59.     At that point, Walsh, based upon his belief probable cause existed, arrested and handcuffed Villaba.  <u>See</u>  Tr. at 17:16-20 (Walsh)("At that point in time, based upon the probable cause that I had observed, packaging consistent with illegal narcotics, I placed the truck down and instructed Mr. Villaba to put his hands behind his back, at which point in time he was placed in handcuffs and, thus, arrested."); Bus Station DVD at 10:26:07-26:32.

60.     During Walsh's questioning of Villaba, he was "talking to him in a way that's consistent with how [he would] talk to anybody who is getting off the bus and in Albuquerque and not getting back on to continue."  Tr. at 11:21-25 (Mysliwiec, Walsh)(" Q.   And were you talking to him in a way that's consistent with how you talk to anybody who is getting off the bus and deboarding in Albuquerque and not getting back on to continue . . . . ?"  "A.   Yes, sir.").

## PROCEDURAL BACKGROUND

On June 11, 2013, Villaba filed his Motion to Suppress, moving the Court to suppress the drug evidence against him.  <u>See</u> Motion to Suppress at 1.  Villaba argues that the Court should

suppress the drug evidence that the Walsh found in the toy truck, because "Villaba never gave specific, unequivocal consent to search the truck.  In fact, to the contrary, he denied consent to search the toy truck."  Motion to Dismiss at 3.  Villaba argues that Villaba's consent was limited to Walsh taking the truck out of the box, and did not include consent to Walsh doing anything further with the truck: "The only consent that Mr. Villaba gave was that Detective Walsh could take the truck out of the box.  Mr. Villaba never consented to the search of the toy truck . . . ."  Motion to Suppress at 4.

Villaba also argues that the Court should suppress the evidence, because his consent was involuntary.  See Motion to Suppress at 4.  Villaba points out that whether his consent was freely and voluntarily depends on the totality of the circumstances, and asserts that the circumstances here show that his consent was involuntary.  See Motion to Suppress at 5-6 (citing United States v. Sedillo, No. 08-1419 JB, 2010 U.S. Dist. LEXIS 21583, 2010 WL 965743, at *2 (D.N.M. 2010)(Browning, J.)).  He provides the following circumstances as evidence that his consent was involuntary: "In this case, 1) there were several officers who exhibited a threatening presence, 2) Detective Walsh used language that suggested compliance was mandatory, and 3) the officers never advised Mr. Villaba he was free to leave."  Motion to Suppress at 6.  The language which Villaba contends suggested his compliance was mandatory was Walsh's "indicat[ion] that he was working the bus station for 'security purposes,'" and his language that he and Perry "''speak to everybody that's coming in and out of the station, we talk to everybody.'"  Motion to Suppress at 6 (quoting Recording of Conversation with Jonathan Walsh on February 21, 2013 at 3:13-25, 5:2-5, filed June 12, 2013 (Doc. 25-1)("Walsh Conversation")).[8]  Villaba contends: "Detective

---

[8] Villaba attached written transcripts of his conversation with Walsh and Perry, which Paul Baca Professional Court Reporters had transcribed from both Walsh's and Perry's belt tape

Walsh states not one, but three times, that he and his partners talk to everybody, then he immediately follows up by asking if now, Mr. Villaba will consent to the search.  Such language absolutely suggests that compliance is mandatory."  Motion to Suppress at 6.

Villaba also argues that, if he consented, Walsh's search exceeded the scope to which he consented.  See Motion to Suppress at 6.  Villaba concedes that he consented some, but only "to removing the truck from the box.  He never consented to Agent Walsh searching the toy truck."  Motion to Suppress at 7.  Pointing out that the scope of consent is based on reasonableness, Villaba asserts: "A reasonable person would have understood that Detective Walsh was going to take the truck out of the box, but that he would not search the truck since consent was denied."  Motion to Suppress at 7.

Villaba contends that, under the circumstances, Walsh lacked probable cause to search the toy truck.  See Motion to Suppress at 7.  Villaba asserts that whether probable exists is viewed from the standpoint of an objectively reasonable police officer, and that "[o]fficers can only draw limited inferences of criminal activity from behavior that is not facially criminal in order to establish probable cause."  Motion to Suppress at 8 (emphasis in original)(citing United States v. Cavely, 318 F.3d 987, 991 (10th Cir. 2003)).  Villaba also refers the Court to the Tenth Circuit's decision in United States v. Nielsen, 9 F.3d 1487 (10th Cir. 1993), a case in which the Tenth Circuit held that an officer's decision to search a defendant's trunk without the defendant's permission was unlawful, to support his contention that Walsh lacked probable cause to search the toy truck here.  See Motion to Suppress at 8-9.  He argues: "[T]he officers justify their

_____

recordings during the encounter.  See Walsh Conversation; Recording of Conversation with Jarrell Perry (taken February 21, 2013), filed June 12, 2013 (Doc. 25-2)("Perry Conversation").  The Court refers to these transcripts in support for several facts in the Analysis section of this Memorandum Opinion and Order, as it is the same evidence that the Court admitted through the admission of the Bus Station DVD.

- 18 -

continued detention and search of Mr. Villaba based upon the alleged facts that, 1) he appeared nervous, 2) the toy truck was heavy and 3) the box was tattered.  These factors are nowhere near sufficient to support probable cause to search the toy truck."  Motion to Suppress at 9-10.  He asserts that "mere nervousness is not enough to support probable cause."  Motion to Suppress at 10 (citing United States v. Wood, 106 F.3d 942, 948 (10th Cir. 1997)).  Villaba further contends that the following cut against finding that Walsh had probable cause to arrest Villaba: (i) that the toy truck had batteries; (ii) that "it is highly doubtful that Detective Walsh had experience with the weight of that particular toy truck;" (iii) and that, because toy stores place toys within children's reach, "toy packaging is tattered in almost every circumstance."  Motion to Suppress at 10.

Villaba argues that the exclusionary rule applies here to suppress all the drug evidence that Walsh found on Villaba, because "Mr. Villaba has shown a constitutional violation and a causal nexus between the violation and the evidence sought to be excluded."  Motion to Suppress at 10-11 (citing United States v. Harmon, 785 F. Supp. 2d 1146, 1160 (D.N.M. 2011)).  Villaba concludes: "Mr. Villaba did not give consent to search the toy truck and any consent given was exceeded.  No probable cause existed to search the toy truck and the drug evidence should respectfully be suppressed."  Motion to Dismiss at 11.

On July 2, 2013, the United States filed the United States' Response to Defense Motion to Suppress (Doc. 30)("Response"), requesting that the Court deny the Motion to Suppress.  See Response at 1.  In response to whether Villaba consented to Walsh's search of the toy truck, the United States argues that the Court should find that "(1) Defendant agreed to the search; (2) neither TFO Walsh nor SA Perry coerced Defendant's consent; and (3) TFO Walsh reasonably believed that the scope of Defendant's consent allowed him to look at the entirety of the toy

truck once out of its packaging." Response at 5. The United States concedes that, when "Walsh initially asked Defendant if he could remove the truck from its packaging . . . to 'take a look' at it," Villaba initially declined, "because he did not want the packaging removed." Response at 6. The United States asserts, however, that, "[o]nce TFO Walsh had addressed Defendant's stated concern by saying that he would do 'as minimal damage to the box as possible,' Defendant agreed to let the search proceed. That consent was unequivocal and un-coerced." Response at 6.

The United States further asserts that Villaba's contention that his consent was limited to removing the truck, but did not extend to inspection of the truck, is disingenuous, because "[t]his contention disregards the fact that TFO Walsh had already disclosed to Defendant that the entire purpose of removing the truck from its packaging was to take a closer look at it." Response at 6. The United states also contends that neither Walsh nor Perry coerced the consent, because they were polite and respectful throughout their questioning. See Response at 6. Conceding that the officers did not inform Villaba that he could leave, the United States points out that this one factor is not dispositive of coercion. See Reply at 7. As to the consent's scope, the United States cites to United States v. Jackson, 381 F.3d 984, 988 (10th Cir. 2004), for the proposition that Perry and Walsh reasonably believed Villaba's consent to extend to Walsh's inspection of the truck. See Response at 7-8.

The United States argues that, "[d]ue to the extensive experience of TFO Walsh and SA Perry, their observations relating to Defendant, the toy truck, and the truck's packaging made them virtually certain that the toy truck would contain contraband." Response at 8 (citing United States v. Jackson, 381 F.3d at 989). The United States points out that "[t]he Tenth Circuit has held that where 'police possess knowledge approaching certainty as to the contents of a container' the plain view exception to the warrant requirement applies.'" Response at 8 (quoting

- 20 -

United States v. Corral, 970 F.2d 719, 725 (10th Cir. 1992)).  The United States asserts that, based on the circumstances, "Walsh had virtual knowledge that the Defendant's toy truck contained contraband."  Response at 9.  These circumstances include Walsh's and Perry's knowledge that drug dealers often use gifts to traffic drugs, that they had found narcotics in toy cars or trucks before this arrest, and that the packaging appeared as there had been tampering. See Response at 9.  The United States concludes:

> The Court should find that Defendant freely and voluntarily offered TFO Walsh unequivocal consent to search the toy truck outside of its packaging. TFO Walsh stayed within his granted scope as he reasonably understood it. Alternatively, TFO Walsh and SA Perry, due to their extensive experience with drug smugglers and their personal observations of Defendant, the toy truck and its packaging, had a virtual knowledge that the truck would contain contraband, and therefore the search was justified under the plain view doctrine.

Response at 10.

On July 23, 2013, Villaba filed Defendant Jose Israel Villaba's Reply to United States' Response to Defendant's Motion to Suppress [Doc. 30].  See Doc. 35 ("Reply").  Villaba argues that the United States' contention that his consent included inspecting the truck "ignores the multitude of case law that states consent to search must be unequivocal, specific and intelligent." Reply at 1 (citing United States v. Gay, 774 F.2d 368, 377 (10th Cir. 1985)).  Villaba contends that Walsh's questioning limited the scope of Villaba's consent, by asking "'I may take it out of the box,'" rather than "'I may take it out of the box and inspect the truck.'"  Reply at 2.  He asserts that he "had already specifically denied consent to search the truck and only consented to take the box out of the truck.  Mr. Villaba never consented to the search of the truck . . . ."  Reply at 2-3 (emphasis in original).

Villaba distinguishes the facts of his case from United States v. Jackson, asserting that, whereas the defendant in United States v. Jackson consented to the officers' search of his bag,

"[t]here is no set of facts under which Mr. Villaba's consent to take the truck out of the packaging constituted consent to search the truck."  Reply at 3.  Additionally, Villaba argues that, whereas the Tenth Circuit took the defendant's failure to object to the search of the container inside the bag as consent to the search's scope in United States v. Jackson, Perry distracted Villaba here so that he could not object to Walsh's search of the truck.  See Reply at 3 (citing, as an e.g. cite, United States v. Vaughn, Second Amended Memorandum Opinion and Order at 18, No. CR 11-1235 MCA (D.N.M. Jan. 7, 2013)(Armijo, J.), filed July 23, 2013 (Doc. 35-1)).

Villaba contends that the United States' argument that Walsh and Perry properly searched the truck according to the plain-view doctrine also "is without merit."  Reply at 4.  Villaba argues that the facts here are distinguishable from Perry's search of a container in United States v. Jackson, because, whereas "Perry had already seen the white powdery substance inside the container he had opened" in United States v. Jackson, "Walsh had absolutely not seen anything that resembled drugs prior to his inspection of the toy truck."  Reply at 4-5.  Villaba refers the Court to the Tenth Circuit's decisions in United States v. Donnes, 947 F.2d 1430, 1438 (10th Cir. 1991), and United States v. Knox, 1995 U.S. App. LEXIS 34695 (10th Cir. Dec. 7, 1995)(unpublished), for the position that the plain-view exception to the probable cause requirement does not apply to the circumstances of his case.  See Reply at 5-6.  Villaba concludes:

> TFO Walsh never received a valid consent to search the truck as required to defeat a 4th Amendment violation. In fact, Mr. Villaba specifically denied consent to search the truck. In addition, the plain view exception does not apply to this case and no probable cause existed to search the truck. Thus, the drug evidence and all evidence obtained afterward must respectfully be suppressed.

Reply at 7.

- 22 -

At the hearing on the Motion to Suppress, Villaba asserted that "consent must be unequivocal, specific, and intelligent."  Tr. at 89:8-9 (Crow).  In response to the Court's inquiry, Villaba conceded that he consented: (i) to "have this conversation" with Walsh and Perry; (ii) to "open the bag;" (iii) to "take the truck out of the bag;" and (iv) to "take [the truck] out of the packaging."  Tr. at 89:10-23 (Court, Crow).  When the Court asked whether he agrees that "there's consent to look at, say, the outside of the truck," Villaba responded: "I would agree that there was consent to remove the truck from its packaging and not further inspect the truck."  Tr. at 90:4-8 (Court, Crow).  The Court asked Villaba what would be the point of asking to remove the truck from the packaging other than to inspect the bottom of the truck; Walsh could already see parts of the truck.  See Tr. at 90:20-25 (Court).  Villaba responded that normally that would be the case, but that here Walsh's language narrowed the scope of what may have otherwise been consent to inspect the bottom of the truck: "[The] [s]pecific consent was to remove it from the box."  Tr. at 91:1-25 (Crow, Court).  In response to the Court's question what Villaba believed Walsh and Perry would do with the toy truck once they took it out of the packaging, Villaba responded: "He may [want] to determine the weight without the box.  I don't know. But there was no consent to actually physically inspect the truck."  Tr. at 92:9-11 (Crow).

The Court referred Villaba to "Perry Conversation" at 3:16-21, in which Walsh asks Villaba whether he would "voluntarily consent for me to look . . . and exam that -- that truck, sir," to which Villaba responds "Yeah."  Tr. at 92:16-23 (Court).  Villaba responded that, "at that point, on the record we have before the Court, that probably is consent to examine the truck," but contends that Villaba then revoked that consent and limited the scope of the consent when Walsh later asked "[m]ay I open the box and take it out of its packaging to look at the truck," and Villaba responded, "unfortunately not."   Tr. at 94:23-95:15 (Crow, Court)(quoting Walsh

Conversation at 7:17-8:1 (Walsh, Villaba)).  Villaba contends that, after this denial of consent, Villaba consented only to Walsh taking the toy truck out of its packaging:

> So then if you go to page 8, line 3, "Okay, if you're going to wrap it later, would you give me consent to take it out and you can put it back in?  If I assure you I will do as minimal damage to the box as possible."  "Sure."  And this is the key question, Your Honor[:]  "I may take it out of the box?"  "Uh-huh."  That's the consent that he gave. He specifically denies consent three questions earlier.

Tr. at 95:16-22 (Crow)(quoting Walsh Conversation at 8:3-11 (Villaba, Walsh)).  Villaba asserted that, if Walsh would have gone one question further and "even added to that question 'I may take it out of the box and inspect it or examine and look at it' . . . . I don't think we would have near as strong a motion hearing."  Tr. at 96:4-9 (Crow).  Villaba argued that Walsh then exceeded the scope of the consent when he flipped over the truck, and when he used a flashlight to see the contraband.  See Tr. at 97:6-11 (Crow).

The Court asked whether, assuming Walsh had Villaba's consent to remove the truck from the packaging and to turn it, Walsh at that point had probable cause to arrest Villaba.  See Tr. at 97:15-21 (Court).  Villaba responded that Walsh did not have probable cause, because his conclusion was based on nervousness, which the Tenth Circuit has held is insufficient to support probable cause.  See Tr. at 97:23-98:2 (Crow).  Villaba asserted that, even setting aside the nervousness, Walsh developed probable cause only when "he had to look inside those little slits," but contended that Walsh "never had probable cause to look inside those little slits."  Tr. at 98:8-13 (Crow).  Villaba asserted that, contrary to the United States' contention, Walsh lacked probable cause to look inside those slits based on the weight of the truck and the "tattered box," because Walsh "testified he's never picked one of these up before, he didn't know what kind of batteries it took," and "he testified that any kid at Kmart could have picked this up."  Tr. at 98:13-22 (Crow).

- 24 -

In response to the Court's question whether Villaba contends that the Court cannot take into its probable cause analysis Walsh's view of the baggie when he flips over the toy truck, Villaba answered: "Well, I think if the court rules that he had the authority to pick that truck up, turn it over, and look inside the truck with a flashlight, that's the point where he develops the probable cause . . . . But he does not have probable cause to look inside that vehicle."  Tr. at 98:23-99:10 (Court, Crow).  The Court asked: "If I find that he had consent to turn the truck over and look at it, there's obviously, some portion of [the contraband] that now is in plain view," to which Villaba conceded: "Yes. Sir."  Tr. at 99:20-23 (Court, Crow).

The Court asked: "If [Walsh] had to use the flashlight to look into the holes, is that plain view?"  Tr. at 100:11-12 (Court).  Villaba responded: "No, Your Honor, because you are looking into the actual container.  You have to have probable cause to search the underbelly of that, which I would argue that he did not have at that point."  Tr. at 100:13-16 (Crow).  Rather, Villaba asserted that probable cause attached only at the moment Walsh, using his flashlight, saw the contraband through the slits.  See Tr. at 100:17-101:4 (Crow).

Villaba concluded by pointing out that "the whole scope of [his] argument" is that Walsh lacked probable cause based on Villaba's limited consent:

> And, Your Honor, that's the whole scope of my argument.  He -- This officer never had the probable cause --
>
> Now, if Mr. Villaba would have consented yeah you can inspect the truck, of course he would have probable cause because he'd look in the truck and he would find the contraband.  However, with that denial of the consent, at the time the officer removes that truck from the packaging he does not have the probable cause to turn that thing over and inspect it, because he's been denied consent to inspect that.  All he has at that point . . . is nervousness a heavy truck an[d] a tattered box.  He doesn't smell any [drugs], he doesn't notice any discrepancies on the ticket, nothing like that.
>
> Your Honor, that is not enough to support probable cause to exceed his

consent and enter into a Fourth Amendment violation with no consent and no
probable cause.  So I think once he turns that vehicle over and looks in there his
scope of consent has been exceeded based on the record, he has no probable cause
to do that and that's when the Fourth Amendment violation occurs.

And there's no exception applicable in this case, Your Honor.

Tr. at 101:15-102:11 (Crow).

The United States asserted that the issue is "whether Agent Walsh went far enough
outside of what the Fourth Amendment allows that we should admonish him for that and not
allow the Government to use this evidence," and pointed out that the United States and Villaba
"seem to agree on most of the facts."  Tr. at 104:10-18 (Mysliwiec).  The United States asserted
that the point of contention is whether Walsh exceeded Villaba's consent when he looked into
the truck and saw the contraband, and contended that Walsh had probable cause to investigate
the inside of the truck by that point.  See Tr. at 104:19-105:1 (Mysliwiec).

The United States listed several factors it contends support finding probable cause.  First,
Villaba's nervousness, which, while "not . . . enough on its own to make up probable cause, but,
as Agent Walsh testified, it goes into his common-sense analysis of the totality of the
circumstances."  Tr. at 105:2-10 (Mysliwiec).  Additionally, the United States asserted that,
although "mere refusal to allow a search" does not itself support probable cause, it plays into the
totality of the circumstances.  Tr. at 105:11-18 (Mysliwiec).  The United States added other
factors that it contends support probable cause, including that Villaba was coming from Phoenix,
which Walsh testified was a common origin for drug trafficking activities in Albuquerque.  The
United States also argued that Villaba's "packaging for a child's toy that takes up the majority of
the volume available in his bag, the fact that he did not have enough clothes . . . for the duration
of a stay in Phoenix," factors into the probable-cause analysis.  Tr. at 105:19-25 (Mysliwiec).  In

- 26 -

addition, the United States pointed out "the wear and tear on the truck that . . . is inconsistent

with normal wear and tear," and also "you have the weight and the balance on the truck."  Tr. at

106:1-6  (Mysliwiec).

       The United States argued that Villaba's unequivocal consent "to look . . . and examine

that -- that truck," Walsh Conversation at 6:4-9 (Walsh, Villaba), while it was inside of the duffle

bag, "is consent for the agent to do everything he can to exam[ine] with his eyes or any other

senses that he might use, without further manipulating or risking damage to any of Mr. Villaba's

personal property,"  Tr. at 109:13-19 (Mysliwiec).   The United States contended that, if,

hypothetically, Villaba was innocent and did not know about the methamphetamine inside of the

truck, objectively, the consent to "take [the] truck out of the bag" and "examine" the truck would

be consent to examine the truck in whatever the officer wished to do so.  Tr. at 109:19-110:6

(Mysliwiec).  The United States asserted that, on page 7 of the Walsh Conversation, when he

asked to take it out of the packaging, "he doesn't mean open the box and take it out of the

package and do something entirely unlike what I was trying to do before, such that he needs to

restate at every turn everything he wants to do, everything he's trying to get consent for."  Tr. at

110:12-17 (Mysliwiec).  The United States conceded that, if Walsh wanted to open the battery

compartment to search for the pound of methamphetamine, he would have needed further

consent.  See Tr. at 110:23-111:2 ((Mysliwiec, Court).  The United States asserted, however:

> [I]f all he has to do is turn that truck over by rotating his wrists 90 degrees and
> look at the bottom of that truck with his eyes, and even if he has to use a
> flashlight, because, as you can see in the video, he's under an overhang, and he
> may be in a shadow, and even if he has to use a flashlight -- a white-light
> flashlight, by the way, not an infrared flashlight, not looking for some forensic
> DNA, pattern, just light, just white light -- even if he has to rotate his wrists 90
> degrees to look with his eyes at the he has to use a flashlight to increase the
> amount of light bouncing off whatever is visible from the outside of that truck,
> while he is looking at the bottom of that truck, while he is using a flashlight,

which people know police to carry, he is standing in a place, he is at a vantage
point where he is allowed to be, and anything he sees there is in plain view.

Tr. at 111:2-17 (Mysliwiec).

In response to the Court's question whether Villaba's later refusal to open the box and
take a look at the truck, and then his consent to Walsh taking it out of the box, limited the scope
of the consent to allow Walsh only to look at the truck, the United States stated:

> [W]hat Mr. Villaba meant and what . . . Agent Walsh reasonabl[y] thought Mr.
> Villaba meant when he said, okay now that you've addressed the packaging
> thin[g,] yeah[,] go ahead and take it out of the packaging, must incorporate as a
> matter of common sense the conversation that has happened until then, which
> includes Mr. Villaba knowing, as everybody here in this room understands, that
> the only reason Agent Walsh wants to take that truck out of its packaging is to
> examine it.  He doesn't want to play with it. . . .  He wasn't taking it out of the
> packaging to roll it along the little ledge there and pretend he was a fireman.  He
> is a cop.

Tr. at 112:19-113:12 (Mysliwiec).  The United States asserted further that, even if the Court were
to find that Villaba's consent did not extend to Walsh the ability to turn the truck over, as soon as
he picked it up, Walsh had probable cause to search the inside of the truck, because of the
"unnatural weight," given that "[a] pound of methamphetamine [is] far more than you would
expect from three AA batteries."  Tr. at 113:20-114:23 (Mysliwiec).

The Court asked the United States whether, assuming the Court finds that Walsh does not
have probable cause until he looks at the bottom at the truck, plain view includes using a
flashlight.  See Tr. at 115:4-7 (Court).  The United States responded: "Yes sir.  Just like plain
view allows a police officer to look inside the windows of a car at night."  Tr. at 115:10-16
(Mysliwiec).

The United States added that, even if the Court finds Walsh did not have probable cause
until he saw the contraband with the flashlight, he had reasonable suspicion at the point he felt

the weight, before he turned it over, and the United States contended that "reasonable suspicion

is enough to examine the outside of the truck from every angle with your eyes."  Tr. at 116:1-

117:3 (Mysliwiec, Court).  The United States asserted that the Tenth Circuit's decision in United

States v. Corral, 970 F.2d 719, 725 (10th Cir. 1992), supports that reasonable suspicion allowed

Walsh to look inside the slits.   See Tr. at 117:7-118:1 (Mysliwiec).   The United States

concluded:

> So the United States's argument is the consent as a reasonable regular
> person or a reasonable regular officer would view given the entire context of the
> conversation up until then included turning the truck over to look at its bottom
> with the naked eye, assisted by a white-light standard flashlight.  And even if
> Your Honor should disagree with that, even if Your Honor should find that the
> consent were limited in a way that the United States would find to be peculiar, but
> that . . . Agent Walsh could examine the left side and the top side, but not the
> bottom side or the right side with his naked eye assisted by a flashlight, that even
> then the elements of suspicion up until then were articulable and reasonable
> suspicion that allowed Agent Walsh to detain that object, and in detention of that
> object he would necessarily be . . .  allowed to look at the bottom and upon
> looking at the bottom in proper light he would be able to see that package and
> then the plain view exception would apply, and, therefore, at no point during this
> investigation did Agent Walsh do anything illegal or anything discourteous or
> anything that violated Mr. Villaba's Fourth Amendment right against unlawful
> search and seizure.

Tr. at 119:4-24 (Mysliwiec).

Villaba responded to the United States' argument that the plain-view exception to the

probable cause requirement made Walsh's search of the truck constitutional, asserting that the

United States' argument fails on the first of the exception's three prongs -- that the officer was

constitutionally at the place from which the evidence could be plainly viewed -- "because there

was a Fourth Amendment violation once [Walsh] inspects . . . the underbelly of that truck

without probable cause nor consent."  Tr. at 120:7-15 (Crow).  Villaba further asserted that, in

relation to the plain-view exception's third prong, in which "the incriminating character has to be

immediately apparent and the evidence in plain view," the incriminating evidence was not immediately apparent under the circumstances here, as Walsh's belief that there were drugs inside the truck was based on "a heavy truck, nervousness, and a tattered box." Tr. at 120:16-23 (Crow). He argued: "Under no set of circumstances does that make it more probable than not that there are drugs in there. It does not make it immediately apparent that there are drugs in there." Tr. at 120:23-121:1 (Crow). Finally, Villaba contend that, because Walsh had to flip the truck and look inside the slits on the bottom of the truck to see the drugs, the plain-view exception does not apply. See Tr. at 121:2-5 (Crow)(citing United States v. Donnes, 947 F.2d at 1430).

After the hearing, on August 6, 2013, the United States filed the United States Supplemental Brief Concerning the Defense Motion to Suppress. See Doc. 39 ("Supp. Brief"). The United States noted that the two issues which stood out the hearing was whether Villaba's consent was broad enough to have "allowed Agent Walsh to rotate the toy truck to examine its undercarriage," and whether "law allows Agent Walsh to have examined the undercarriage even if that examination was not within the scope of Defendant's consent." Supp. Brief at 1. The United States argues that any consideration of the scope of Villaba's consent must look at the entire conversation, and asserts that "[a]ny common sense examination of that conversation must include its context and history." Supp. Brief at 2. The United States contends: "There is no legal support for the theory that Defendant initially declining to consent to Agent Walsh taking the truck out of its packaging requires Agent Walsh to re-do the entire conversation, or to 'start from square one' as it were." Supp. Brief at 2. The United States asserts that, when Villaba consented to Walsh taking the toy truck out of the packaging he well "knew that Agent Walsh wanted to examine it." Supp. Brief at 2.

- 30 -

The United States also asserts that, "as Agent Walsh was examining the truck, using a white-light flashlight to counteract the shadows of the area, Defendant did not object or rescind his voluntary consent, even though he could clearly see what Walsh was doing." Supp. Brief at 2-3. The United States argues that Villaba's actions -- or failure to object to Walsh's examination of the toy truck -- on the video are consistent with consenting to Walsh's examination of the toy truck, and are inconsistent with his argument that he did not consent to the examination. See Supp. Brief at 3. The United States asserts:

> Because Defendant meant by his consent to allow Agent Walsh to examine the toy truck outside of its packaging, and because Agent Walsh reasonably and correctly understood Defendant's plain meaning, the Court should hold that Agent Walsh did not exceed the scope of the consent he was given in examining the truck, and therefore deny Defendant's suppression motion.

Supp. Brief at 3.

The United States also argues that, even if Villaba's consent did not extend to Walsh's examination of the toy truck, "Agent Walsh did not violate the law in doing so because he had reasonable suspicion that Defendant was transporting narcotics in that toy truck." Supp. Brief at 3. The United States asserts:

> That reasonable suspicion allowed Agent Walsh to detain the truck temporarily, which allowed him to examine its undercarriage. That examination in turn allowed Agent Walsh to see the narcotics packaging inside, which was sufficient to give Agent Walsh probable cause to arrest Defendant and retain the truck and its contents as evidence. No more is required for Agent Walsh's actions to have been lawful.

Supp. Brief at 3. The United States contends that eight pieces of evidence provided Walsh reasonable suspicion that Villaba was transporting narcotics in the toy truck:

> 1. Defendant's extreme nervousness upon being approached by law enforcement; 2. Defendant having come from Phoenix, AZ, a known source for narcotics coming into New Mexico; 3. The length of Defendant's stay in Phoenix, AZ; 4. Defendant's bag containing less clothing than Agent Walsh would expect given

the length of stay in Phoenix, AZ that Defendant described; 5. A child's toy taking up the majority of the room available in Defendant's bag; 6. The packaging for the child's toy being extremely worn, to an extent inconsistent with having been purchased at K-Mart and transported for a few days as Defendant claimed; 7. The toy appearing to have been removed from the packaging and then re-attached; 8. The unnatural heavy weight of the toy, and the unnaturally bad balance of the weight of the toy.

Supp. Brief at 4. The United States contends that, once these facts provided Walsh reasonable suspicion, under United States v. Place, 462 U.S. 696 (1983), "[t]hat reasonable suspicion allowed Agent Walsh to temporarily detain the toy truck for examination." Supp. Brief at 4-5 (citing United States v. Place, 462 U.S. at 706).

The United States points out that United States v. Place allows an officer to detain luggage to dispel the officer's suspicion only for a reasonable time, and asserts that, "[t]hough the video recording in evidence will reveal the exact amount of time it took Walsh to perform this brief examination, the United States takes the position that it was very brief indeed . . . ." Supp. Brief at 5. Additionally, the United States notes that Villaba argued at the suppression hearing that Walsh's use of the flashlight was "impermissible," but it asserts that "[t]he Tenth Circuit has made clear that use of artificial light to illuminate a darkened area does not constitute a search, and thus triggers no Fourth Amendment protection." Supp. Brief at 5 (citing United States v. Gonzalez-Acosta, 989 F.2d 384, 387 (10th Cir. 1993)). The United States further asserts: "Likewise, an officer may change his position and examine the undercarriage of a vehicle." Supp. Brief at 5-6 (citing United States v. Gonzalez-Acosta, 989 F.2d at 387-88).

The United States contends that, in light of this Supreme Court and Tenth Circuit precedent, once Walsh undertook the lawful examination of the toy truck's underside, "he was able to see through the slits or vents in the toy plastic-wrapped and taped bundles inside, consistent with illegal narcotics and inconsistent with a store-bought toy." Supp. Brief at 6.

According to the United States, after observing these facts, and confirming with Villaba that he bought the toy new, "in addition to the other evidence he had, gave Agent Walsh . . . probable cause.  Based on that probable cause, Agent Walsh arrested Villaba."  Supp. Brief at 6.[9]

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment's protections are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment to the United States Constitution.   See Mapp v. Ohio, 367 U.S. 643, 655 (1961); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against

---

[9] The Court is aware that, on August 9, 2013, Villaba filed the Defendant's Motion to Strike United States' Supplemental Brief Concerning the Defense Motion to Suppress (Doc. 41)("Motion to Strike"), "mov[ing] the Honorable Court to strike the United States' Supplemental Brief Concerning the Defense Motion to Suppress."  Motion to Strike at 1. Villaba points out that, "[a]fter the motion hearing, the Court neither requested nor authorized supplemental briefing," that "[t]he government did not seek leave of the Court to file the supplemental brief nor a surreply," and asserts that "[t]he supplemental brief was not authorized by the Court or the Federal Rules of Criminal Procedure."  Motion to Strike at 2.  He contends: "Thus, it should not be part of the record in this matter," and asks that the Court "strike the supplemental brief as not being authorized by either the Court or the rules."  Motion to Strike at 2.

The Court has set a hearing on the Motion to Strike for August 21, 2013, so the Court need not decide the Motion to Strike in this Memorandum Opinion and Order. The Court can say, however, that the United States' Supp. Brief did not affect the Court's analysis.  The Court did not review the Supp. Brief until after it had substantially completed its analysis.  While the Court reached some of the same conclusions, and relied on United States v. Place in its analysis, the Court reached those conclusions on its own, and the overlap is coincidental.

The Court will, however, allow the parties to argue the Motion to Strike.  While the Court is not inclined to grant the Motion to Strike, it will allow Villaba to argue his motion, file an additional response brief, and, if he feels it appropriate, ask the Court to reconsider its decision.

state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment."). "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d at 1157. See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). The Supreme Court of the United States has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.      Whether a Fourth Amendment Violation Occurred.

"A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information." United States v. Alabi, No. CR 11-2292 JB, 2013 WL 1876791, at *33 (D.N.M. Apr. 30, 2013)(Browning, J.)(citing United States v. Jones, 132 S. Ct. 945, 947 (2012)("[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." (emphasis omitted))(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992))). "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines,

133 S. Ct. 1409, 1414 (2013)(quoting United States v. Jones, 132 S. Ct. at 950 n.3). "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment.'" Illinois v. Caballes, 543 U.S. 405, 409 (10th Cir. 2005)(quoting United States v. Jacobsen, 466 U.S. 109, 123 (1984)).

### a.     Trespass-Based Analysis.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")). "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." United States v. Jones, 132 S. Ct. at 951 n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t] resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggested that, under the trespass-based analysis, a trespass implicates Fourth Amendment interests only when the trespass occurs in one of the four places or things listed in the Fourth Amendment's text:

- 35 -

The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz[v. United States, 389 U.S. 347 (1967)]) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 133 S. Ct. at 1414.

            b.       **The *Katz v. United States* Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).  "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."  United States v. Jones, 44 F.3d at 871 (emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).  The Tenth Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched."  United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests depends on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable."  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).  See United States v. Poe, 556 F.3d 1113,

1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.  Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(internal citations omitted)(quoting United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir. 2003)).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes is easier to "assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States.  Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) --  which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"  Kyllo v. United States, 533 U.S. at 33 (emphasis in

original)(quoting <u>California v. Ciraolo</u>, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" <u>United States v. Jones</u>, 132 S. Ct. at 951.  <u>See</u> <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." <u>Rakas v. Illinois</u>, 439 U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the <u>Katz v. United States</u> reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." <u>United States v. Arango</u>, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i.      Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'" <u>Bond v. United States</u>, 529 U.S. at 338 (internal alterations omitted)(quoting <u>Smith v. Maryland</u>, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection." <u>Katz v. United States</u>, 389 U.S. at 351.  The Supreme Court has noted:

This Court has held repeatedly that the Fourth Amendment does not prohibit the

> obtaining of information revealed to a third party and conveyed by him to
> Government authorities, even if the information is revealed on the assumption that
> it will be used only for a limited purpose and the confidence placed in the third
> party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect. In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would
> provide an inadequate index of Fourth Amendment protection. For example, if
> the Government were suddenly to announce on nationwide television that all
> homes henceforth would be subject to warrantless entry, individuals thereafter
> might not in fact entertain any actual expectation or privacy regarding their
> homes, papers, and effects. Similarly, if a refugee from a totalitarian country,
> unaware of this Nation's traditions, erroneously assumed that police were
> continuously monitoring his telephone conversations, a subjective expectation of
> privacy regarding the contents of his calls might be lacking as well. In such
> circumstances, where an individual's subjective expectations had been
> "conditioned" by influences alien to well-recognized Fourth Amendment
> freedoms, those subjective expectations obviously could play no meaningful role
> in ascertaining what the scope of Fourth Amendment protection was. In
> determining whether a "legitimate expectation of privacy" existed in such cases, a
> normative inquiry would be proper.

442 U.S. at 740 n.5. Most recently, in Jones v. United States, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no
> reasonable expectation of privacy in information voluntarily disclosed to third
> parties. This approach is ill suited to the digital age, in which people reveal a
> great deal of information about themselves to third parties in the course of
> carrying out mundane tasks. People disclose the phone numbers that they dial or
> text to their cellular providers; the URLs that they visit and the e-mail addresses

with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).

### ii.    Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of <u>Katz v. United States</u>' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [the subjective privacy] expectation as objectively reasonable."  <u>United States v. Ruiz</u>, 664 F.3d, 833 838 (10th Cir. 2012)(<u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000)).  The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."  <u>United States v. Jacobsen</u>, 466 U.S. at 122.

Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects.  <u>See</u> <u>California v. Ciraolo</u>, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting <u>Oliver v. United States</u>, 466 U.S.

170, 181-83 (1984)).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  W. LaFave, supra, §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on society's understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

### 2.    **Consensual Searches**.

A person's consent to a search of the person's property constitutes one exception to the Fourth Amendment's search warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness,

which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"   United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, no one factor is dispositive in a court's inquiry into the circumstances.  See United States v. Peña, 143 F.3d at 1366.  For example, although an officer's failure to advise a defendant that the defendant is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court

has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.

Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  See United States v. Romero, 743 F. Supp. 2d 1281, 1307 (D.N.M. 2010)(Browning, J.)("Having a holstered or slung weapon does not -- without more --render a law-enforcement officer's request for entry coercive, or nearly every such request would be coerced; for law-enforcement officers, firearms are standard equipment.").  "[I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

"Because 'indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment,'" however, "[w]hen an official search is properly authorized -- whether by consent or by the issuance of a valid warrant -- the scope of the search is limited by the terms of its authorization."  Walter v. United States, 447 U.S. 649, 656 (1980)(quoting Payton v. New York, 445 U.S. 573, 583 (1980)).  The Tenth Circuit has thus pointed out that "'[t]he scope of a search

is generally defined by its expressed object, and is limited by the breadth of the consent given.'" United States v. Anderson, 114 F.3d 1059, 1065 (10th Cir. 1997)(quoting United States v. Elliot, 107 F.3d 810, 813 (10th Cir. 1997)).  The Tenth Circuit analyzes a person's consent under the Supreme Court's objective reasonableness test, which asks: "'What would the typical reasonable person have understood by the exchange between the officer and the suspect?'"  United States v. Anderson, 114 F.3d at 1065 (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

The Tenth Circuit has held that a defendant's consent for law enforcement officers to search his luggage for narcotics included consent to search packages inside the bag that could reasonably contain narcotics.  See United States v. Jackson, 381 F.3d 984 (10th Cir. 2004); United States v. Ramstad, 308 F.3d 1139, 1146-47 (10th Cir. 2002)(noting that where officer has indicated his intent to search for drugs or contraband, a suspect's consent "certainly implies that the officer could look wherever drugs might be hidden").  In United States v. Jackson, the DEA agent, Jarrell Perry -- the same agent Perry involved in this case -- asked the defendant, who was stopped on an Amtrak train at the Albuquerque train station, whether he would consent to Perry's search of his bag for contraband, including narcotics, and the defendant responded "yes."  381 F.3d at 987 (internal quotations omitted).  Inside the bag, Perry found a shaving kit, which included a baby powder container "which bulged and appeared heavier and harder than normal baby powder containers."  381 F.3d at 987.  Perry asked the defendant two or three times if the defendant owned the baby powder containers, but the defendant was silent.  The Tenth Circuit noted that "Perry knew of other drug interdiction cases in which baby powder containers were used to conceal powdered cocaine and methamphetamine."  381 F.3d at 987.  Perry opened the baby powder container with his leatherman tool, he "moved some of the baby powder aside with the blade and saw a clear plastic bag hidden inside the container," which he saw contained a

- 44 -

white powdery substance that he believed consistent with powdered cocaine.  381 F.3d at 987.

"Throughout these events, Jackson stood a few feet from Perry, quietly looking straight ahead."

381 F.3d at 987.  Perry then arrested the defendant.  See 381 F.3d at 987.

The Tenth Circuit in Untied States v. Jackson held that "[t]he search of the baby powder

container was within the scope of Jackson's consent to the search of his bag."  381 F.3d at 988.

The Tenth Circuit reasoned that the record supported the district judge's conclusion that the baby

powder container's search was within the scope of the consent:

> Agent Perry told Jackson that he wanted to search the bag for narcotics. Jackson's
> consent to the search of his bag for narcotics could be reasonably construed as
> consent to search any containers within the bag which could have held narcotics,
> such as the baby powder container. Furthermore, Jackson was standing near Perry
> throughout the search but yet remained silent and did not object to the search of
> the baby powder container. Under such circumstances, the search of the baby
> powder container was within the scope of Jackson's consent.

371 F.3d at 988 (internal citations omitted)(citing United States v. Marquez, 337 F.3d 1203,

1207 (10th Cir. 2003), superseded on other grounds by United States v. Groves, 369 F.3d 1178,

1183 (10th Cir. 2004); United States v. Ramstad, 308 F.3d at 1146-47).

### 3.  The Plain-View Exception.

The Supreme Court has held that the Fourth Amendment's prohibition on unreasonable

searches and seizures does not implicate what a person knowingly exposes to the public in plain

view.  See Katz v. United States, 389 U.S. 347, 351 (1967)("What a person knowingly exposes

to the public . . . is not a subject of Fourth Amendment protection.").  Evidence which is

recovered during "a truly cursory inspection -- one that involves merely looking at what is

already exposed to view, without disturbing it -- is not a 'search' for Fourth Amendment

purposes, and therefore does not even require reasonable suspicion."  Arizona v. Hicks, 480 U.S.

321, 328 (1987).  See United States v. Nicholson, 144 F.3d 632, 636 (10th Cir. 1998)("[A] visual

- 45 -

inspection of that which is in plain view does not constitute a search.")(citing Arizona v. Hicks, 480 U.S. at 328). Evidence or items of contraband discovered in plain view by an officer who is lawfully on the premises are thus admissible as evidence regardless whether the officer was executing a valid search warrant. See Georgia v. Randolph, 547 U.S. 103, 137 (2006). See United States v. Romero, 743 F. Supp. 2d at 1307 ("An officer, therefore, does not violate a person's Fourth Amendment rights if the officer is not executing a search warrant, but discovers evidence in plain view, so long as the officer is lawfully on the premises.").

There are three requirements to justify the warrantless seizure of evidence in plain view: "(i) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (ii) the item's incriminating character is immediately apparent; and (iii) the officer has a lawful right of access to the object itself." United States v. Morales-Ortiz, 376 F. Supp. 2d 1131, 1139 (D.N.M. 2004)(Browning, J.)(citing Horton v. California, 496 U.S. 128, 136-37 (1990)).

The plain view doctrine does not constrain officers to viewing the evidence with their bear eyes or from a particular position. For example, the Supreme Court has held that "the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection." Texas v. Brown, 460 U.S. 730, 740 (1983)(plurality opinion)(citations omitted). The Tenth Circuit has noted: "Likewise, an officer may 'change his position' and 'bend down at an angle' to see what is inside a car, because 'there is no reason why an officer should be precluded from observing what would be entirely visible to him as a private citizen.'" United States v. Gonzalez-Acosta, 989 F.2d 384, 387 (10th Cir. 1993)(internal alterations omitted)(quoting Texas v. Brown, 460 U.S. at 740).

Moreover, the Tenth Circuit has held that, "when a container is 'not closed, or

transparent, or when its distinctive configuration proclaims its contents, the container['s] . . .

contents can be said to be in plain view.'" United States v. Corral, 970 F.2d 719, 725 (10th Cir.

1992)(original alterations omitted)(quoting United States v. Donnes, 947 F.2d 1430, 1436 (10th

Cir. 1991)). Additionally, "where the police already possess knowledge approaching certainty as

to the contents of the container, the search of the container does not unreasonably infringe upon

the individual interest in preserving the privacy of those contents." United States v. Corral, 970

F.2d 719, 725-26 (10th Cir. 1992).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's constitutional rights, the

government will be prohibited from using that evidence in a criminal prosecution of that person.

See United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in

violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of

the illegal search and seizure.")(citations omitted). In addition, a defendant may also suppress

any other evidence deemed to be the "fruit of the poisonous tree," because it is evidence which

was discovered as a direct result of the unlawful law enforcement activity. United States v.

Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006). To suppress evidence that was

derived following unlawful activity, the defendant must show that there is a factual nexus

between the illegality and the challenged evidence. See United States v. Olivares-Rangel, 458

F.3d at 1109; United States v. Nava-Ramirez, 210 F.3d at 1131.

For the exclusionary rule to apply, the defendant must show, by a preponderance of the

evidence, a constitutional violation, and a causal nexus between the violation and the evidence

sought to be excluded. See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).

Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged

evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

## ANALYSIS

Villaba asserts that he denied Walsh his consent to search the toy truck.  See Motion to Suppress at 3.  First, he asserts that he did not freely and voluntarily give his consent, because his encounter with Walsh was coercive, and Walsh coerced his consent.  See Motion to Suppress at 5-6.  Villaba also contends that, if he consented to Walsh removing the toy truck from the packaging, Walsh's examination of the truck exceeded the scope of Villaba's consent.  See Motion to Suppress at 6-7.  The United States argues that Villaba freely and voluntary consented to Walsh's search of the toy truck, and that Walsh's search did not exceed Villaba's consent. See Response at 5-9.  The Court agrees with the United States.

The Court concludes that Villaba freely and voluntarily consented to Walsh's search, and that the scope of Villaba's consent included Walsh's visual examination of the truck.  As an alternative grounds for the constitutionality of Walsh's examination, the Court concludes that, at the time Walsh allegedly exceeded the scope of Villaba's consent by flipping over the truck to examine the truck's underside, Walsh had reasonable suspicion based on the circumstances to detain the truck.  Because he discovered the tape-wrapped bag containing the drugs, the incriminating nature of which was immediately apparent, in plain view while investigating the basis of his suspicion -- that the truck contained narcotics -- his examination was lawful. Additionally, that Walsh used his flashlight to assist his discovery of the drugs does not affect the constitutionality of Walsh's search.  Accordingly, the Court will deny the Motion to Dismiss and will not suppress the drug evidence.

I.    **VILLABA FREELY AND VOLUNTARILY GAVE HIS CONSENT**.

Villaba argues that his consent was coerced, because "1) there were several officers who exhibited a threatening presence, 2) Detective Walsh used language that suggested compliance was mandatory, and 3) the officers never advised Mr. Villaba he was free to leave."  Motion to Suppress at 6. The Tenth Circuit has provided a two-part test for determining, as a matter of fact, voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878).  The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, 2010 WL 965743, at *12 (quotations, alterations, and citations omitted).

The Court concludes that these factors weigh in favor of finding that Villaba volunteered his consent.  First, for much of the encounter, including when Villaba opened his bag to show its contents to Walsh, Walsh was the only officer talking to Villaba; Perry appeared later in the conversation.  Second, Walsh used a pleasant and respectful tone, referring to Villaba as "sir" throughout the encounter, and Perry used a similarly pleasant tone and conducted himself in a similarly pleasant manner.  Third, Walsh, upon receiving Villaba's ticket and inspecting it,

quickly returned the ticket to Villaba.  Walsh never asked for or obtained Villaba's identification.  Fourth, the encounter took place in a public location, and in public view, as it took place at the front of the Albuquerque train and bus station, and, as is apparent from the Bus Station DVD, several members of the public passed nearby the officers and Walsh.

In relation to the fifth factor, whether the officers told Villaba he was free to leave, the officers did not so advise Villaba.  As the Court has recognized, however, "the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary."  United States v. Alabi, No. CR 11-2292 JB, 2012 U.S. Dist. LEXIS 188166, at *101 (D.N.M. May 15, 2012)(Browning, J.)(citing Schneckloth v. Bustamonte, 412 U.S. at 232).  Additionally, although Villaba cross examined Walsh about the fact that, after Villaba walked over to the ledge to show him the contents of Villaba's duffle bag, he was standing in front of the bus station's nearest exit, the Court has pointed out that "the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, 'should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way.'"  United States v. Alabi, 2012 U.S. Dist. LEXIS 188166, at *101  (alterations in original)(quoting United States v. Drayton, 536 U.S. at 205).

Finally, both the sixth and the seventh factors counsel that Villaba volunteered his consent.  Walsh's gun was underneath his jacket during the encounter, and so Villaba could not see it during the encounter.  Neither Walsh nor Perry touched Villaba until they saw the contraband inside of the toy truck, and instructed Villaba to place his hands behind his back and arrested him.

Villaba contends, however, that Walsh's "indcat[ion] that he was working the bus station

for 'security purposes'" suggested that Villaba's compliance was mandatory, and Walsh's language that he and Perry "'speak to everybody that's coming in and out of the station, we talk to everybody,'" coerced his consent. Motion to Suppress at 6 (citing Walsh Conversation at 3:13-25, 5:2-5 (Walsh, Villaba)). He asserts: "Detective Walsh states not one, but three times, that he and his partners talk to everybody, then he immediately follows up by asking if now, Mr. Villaba will consent to the search. Such language absolutely suggests that compliance is mandatory." Motion to Suppress at 6. These statements were not completely accurate and provided misinformation to Villaba. Before Walsh asked for permission to search Villaba's bag, however, he made clear that he intended to search for contraband, including illegal drugs. After finding out that Villaba was travelling from Albuquerque to Phoenix, Walsh first asked Villaba if he was "moving any illegal weapons, narcotics, contraband, stuff like that across [state] lines" less than one minute after initiating the encounter with Villaba. Bus Station DVD at 10:19:47-20:41 (Walsh, Villaba). After Villaba answered "No," Walsh immediately asked Villaba whether he "[w]ould . . . voluntarily consent to a search[] [of] your baggage for that." Bus Station DVD at 10:20:41-20:45 (Walsh, Villaba).

Moreover, although Walsh's assertions that he and Perry talk to everyone -- for security purposes -- although not completely accurate, are not coercive and did not suggest that Villaba's compliance was mandatory. Coercion implies that there is a threat or a leveraging of power to obtain a person's agreement to act. See coercion, Black's Law Dictionary 294 (9th ed. 2009)("Compulsion by physical force or threat of physical force."). Although Walsh telling Villaba, in response to Villaba's question why they singled him out, that he talks to everyone and that he was there for security purposes -- when he admits that he was there performing a drug interdiction for law enforcement purposes -- may have been a lie, it was not a threat or an act in

which Walsh was leveraging his law enforcement power to coerce Villaba's consent.  Villaba
may have felt more patriotic by complying with Walsh's request to search his bag for security
purposes, as opposed to a search for law enforcement purposes, but the fact remains that he
consented to the search.  The Court therefore concludes that Villaba's consent was freely and
voluntarily given.

## II.     THE SCOPE OF VILLABA'S CONSENT WAS BROAD ENOUGH TO INCLUDE WALSH'S VISUAL EXAMINATION OF THE TOY TRUCK'S UNDERSIDE.

Although Villaba conceded at the hearing that he gave Walsh consent to search his duffle
bag, and even to take the truck out of the bag to examine it, he contends that, when Walsh asked
him if he could take the toy truck out of its packaging to look at the truck, and when Villaba
answered "unfortunately not," Villaba revoked his consent.   Tr. at 94:23-95:15 (Crow,
Court)(quoting Walsh Conversation at 7:17-8:1 (Walsh, Villaba)).  Villaba argues that, after this
denial and revocation of consent, Villaba consented to Walsh only taking the toy truck out of its
packaging, and not to Walsh examining the toy truck, which consent Walsh then exceeded when
he flipped the truck over.  The United States responds that, in the context of the conversation,
given that Walsh made clear that he was searching for narcotics, and given that Walsh had
previously made clear that he wished to examine the truck, Villaba's consent to Walsh removing
the truck from its packaging extended to Walsh's visual examination of the truck.  See Tr. at
112:19-113:12 (Mysliwiec).  The Court agrees with the United States that Villaba's consent
extended to Walsh's visual examination of the outside of the toy truck.

The Tenth Circuit has recognized that "'[t]he scope of a search is generally defined by its
expressed object, and is limited by the breadth of the consent given.'"   United States v.
Anderson, 114 F.3d at 1065 (quoting United States v. Elliot, 107 F.3d at 813).  The breadth of

the consent given, however, is analyzed using an objective reasonableness test, which asks: "'What would the typical reasonable person have understood by the exchange between the officer and the suspect?'"  United States v. Anderson, 114 F.3d at 1065 (quoting Florida v. Jimeno, 500 U.S. at 251).  The Supreme Court's language is important in this case for two reasons.

First, the Supreme Court articulated the objective reasonableness in a manner in which "the exchange between the officer and the suspect" governs the consent's scope.  Florida v. Jimeno, 500 U.S. at 251 (emphasis added).  The Supreme Court did not articulate the standard, as Villaba advocates, to depend on the particular phrase in which the suspect provides the officer consent, or even to depend on the suspect's exact language. Rather, the Supreme Court's holding focuses on the exchange.  Here, after finding out that Villaba was travelling from Albuquerque to Phoenix, Walsh first asked Villaba if he was "moving any illegal weapons, narcotics, contraband, stuff like that across [state] lines" less than one minute after initiating the encounter with Villaba.  Bus Station DVD at 10:19:47-20:41 (Walsh, Villaba).  After Villaba answered "No," Walsh immediately asked Villaba whether he "[w]ould . . . voluntarily consent to a search[] [of] your baggage for that."  Bus Station DVD at 10:20:41-20:45 (Walsh, Villaba). From the initiation of the consensual encounter -- i.e., "the exchange," Florida v. Jimeno, 500 U.S. at 251 -- Walsh informed Villaba of his purpose for being at the bus station and for initiating the consensual encounter with Villaba and informed Villaba that his purpose in the exchange was to search Villaba and his luggage for contraband, including illegal narcotics.

Second, the Supreme Court's language shows that the test is an objective one; the test is one in which the consent's scope depends on what the "the typical reasonable person" would have "understood by the exchange."  Florida v. Jimeno, 500 U.S. at 251.  In other words,

Villaba's subjective belief about the scope of his consent is inapposite to the Court's analysis. Villaba could have believed -- subjectively -- that, by responding to Walsh's request for Villaba's consent to take the toy truck out of the packaging with the phrase, "[u]nfortunately not because I was gonna wrap it," Walsh Conversation at 7:23-24 (Villaba), he was revoking his previous consent. He could have also believed -- subjectively -- that the consent he granted to Walsh by responding "[s]ure" to Walsh's request to "take [the toy truck] out of the box," Walsh Conversation at 8:8-10 (Walsh, Villaba), limited his consent to Walsh removing the toy from the box only, and did not include Walsh flipping over the truck or otherwise further examining the truck. The scope of the consent that Villaba provided to Walsh does not depend, however, on his subjective beliefs. Rather, it depends on what "the typical reasonable person" would have understood by listening to the entire exchange. Florida v. Jimeno, 500 U.S. at 251.

Throughout the exchange, Walsh continues to ask for permission to "search" Villaba and his baggage, including asking for Villaba's consent to "a narcotics canine" search of Villaba's bag, Walsh Conversation at 4:20-22 (Walsh), asking Villaba, when Villaba opens the bag, whether he's consenting to a search of the bag, see Walsh Conversation at 5:7-8 (Walsh), and asking if Villaba would voluntarily consent to Walsh "examin[ing]" the toy truck, Walsh Conversation at 6:4-8 (Walsh). While Villaba is correct that, when Villaba consents to Walsh "tak[ing] it out of the box," Walsh did not qualify what he was intending to do with the toy truck, in the context of "the exchange between the officer and the suspect," Florida v. Jimeno, 500 U.S. at 251 (emphasis added), the typical reasonable person would thus understand that Villaba's answers of "[s]ure" and "uh-huh," Walsh Conversation at 8:8, 8:11 (Villaba), consented to Walsh's visual examination or search of the outside of the toy truck when he took it out of the box. It is hard to imagine why else Walsh asked to get the toy out of the box if he did not want

to examine the parts of the truck that he could not see while the truck was in its packaging. Whereas Villaba contends that "[a] reasonable person would have understood that Detective Walsh was going to take the truck out of the box, but that he would not search the truck since consent was unequivocally denied," Motion to Dismiss at 7, the Court cannot soundly adopt Villaba's logic.

Logically, the typical reasonable person, even asked by a police officer only to remove a toy truck from its box -- aside from the rest of Villaba's and Walsh's exchange -- would reasonably understand that the police officer intended at least to examine the outside of the toy truck. Maybe the typical reasonable person would not know for what the police officer was searching, but the typical reasonable person would understand that the police officer did not want to play with the child's toy. The typical reasonable would understand that the police officer would not take the time to remove a toy truck from its packaging, having assured the person to do as minimal damage as possible, just "to determine the weight without the box." Tr. at 92:9-11 (Crow). If the toy truck was already wrapped, or was contained within a gift box in which Walsh could not see that a toy truck was inside of the box, that scene would paint a different picture. It is not difficult to assess what a toy, which is covered on only two of four sides, would weigh if separated from its cardboard packaging, especially when added to the toy truck's weight is a pound of methamphetamine.

While perhaps Villaba's argument that Walsh limited the scope of any consent he could obtain from Villaba when he asked only to "take [the truck] out of the box" may be what a seasoned transactional attorney would have understood from Walsh's and Villaba's exchange, it is not what the typical reasonable person would have understood. Walsh Conversation at 8:9-1 (Walsh). "[T]he typical reasonable person," rather, having heard the entire exchange between

- 55 -

Walsh and Villaba would have understood the breadth of Villaba's consent to cover Walsh visually examining the sections of the toy truck that he could not see with the toy in the packaging.  Florida v. Jimeno, 500 U.S. at 251.  Villaba's consent, therefore, was broad enough to cover Walsh's visual examination of the truck, including its underside.

Tenth Circuit precedent cases suggest that any limitation on the breadth of consent to search an area or an object likely must come from the person consenting, and not from the law enforcement officer.  See United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999)("We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search . . . is an indication the search was within the scope of consent.")(emphasis added).  Cf. Florida v. Jimeno, 500 U.S. at 251 (concluding that the suspect's consent to search his car for narcotics included searching containers inside the car, because "[r]espondent granted Officer Trujillo permission to search his car, and did not place any explicit limitation on the scope of the search.").

Likewise, the Tenth Circuit's continued recognition that an individual's failure to object to the scope of an officer's search at the time the officer allegedly exceeds the scope supports the Court's conclusion that Walsh's search did not exceed the scope of Villaba's consent.  In United States v. Marquez, for instance, the Tenth Circuit, in reaching the conclusion that the defendant's consent to search his recreational vehicle ("RV") included the RV's storage compartment, noted that, "at no time did Mr. Marquez . . . indicate that he did not wish the officers to search the compartment," pointing out that "a fact this court has often found significant in determining whether a law enforcement officer has exceeded the scope of a suspect's consent."  337 F.3d at 1208-09.  In support for the proposition that a defendant's failure to object to an officer's search is probative of the breadth of consent, the Tenth Circuit quoted from its decision in United States

v. Gordon, in which the Tenth Circuit stated: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, <u>and failure to object when the search exceeds what he later claims was a more limited consent</u>, is an indication the search was within the scope of consent."  173 F.3d at 766 (emphasis added).  <u>See also</u> <u>United States v. Jackson</u>, 381 F.3d at 988 (noting that, as evidence that the defendant's consent to search his luggage included searching inside of a closed baby powder container, the defendant "was standing near Perry throughout the search but yet remained silent and did not object to the search of the baby powder container.")(internal citations omitted)(citing <u>United States v. Marquez</u>, 337 F.3d at 1207; <u>United States v. Ramstad</u>, 308 F.3d at 1146-47).

Here, like the defendants in these Tenth Circuit cases, Villaba did not object to Walsh's conduct when Walsh allegedly exceeded the scope of Villaba's consent by turning over the toy truck to examine the truck's underside.  <u>See</u> Bus Station DVD at 10:22:59-25:52.  Whereas Villaba contends that he could not object to Walsh's conduct, as "it is clear from the transcript that Agent Perry was distracting Mr. Villaba during the search," Reply at 3, although Perry was indeed engaging Villaba in conversation during this time, the Bus Station DVD shows that Villaba was carefully -- and understandably, given the truck's contents -- watching Walsh examine the truck.  Villaba was standing next to Walsh, Villaba primarily had his eyes on Walsh rather than on Perry, and Villaba's conversation with Perry was distracted because he was watching Walsh watch the truck.  <u>See</u> Bus Station DVD at 10:22:59-25:52.  There was ample time, between the time at which Walsh removed the truck from its packaging, flipped over the truck and examined the underside with his eyes and then with his flashlight, in which Villaba could have objected to Walsh's conduct allegedly exceeding the scope to which Villaba intended to consent. Perry did not, therefore, impede Villaba's ability to object to Walsh's conduct.

The Court thus concludes that the scope of Villaba's consent covered Walsh's inspection of the object which Walsh asked to remove from the cardboard packaging -- the toy truck -- and that the exchange between Walsh and Villaba, taken objectively, showed that the consent was broad enough to cover Walsh's visual examination of the toy truck, including the toy truck's underside.[10]   See United States v. Anderson, 114 F.3d at 1065 ("'The scope of a search is generally defined by its expressed object, and is limited by the breadth of the consent given.")(quoting United States v. Elliot, 107 F.3d at 813).

### III.   EVEN IF VILLABA'S CONSENT WAS NOT BROAD ENOUGH TO EXTEND TO WALSH'S TURNING OVER THE TOY TRUCK TO EXAMINE THE UNDERSIDE OF THE TRUCK, WALSH PROPERLY DETAINED THE TRUCK BASED ON REASONABLE SUSPICION.

---

[10] The United States did not argue that Villaba's consent extended to searching inside the toy truck, and focused rather on whether "Villaba consent[ed] for Agent Walsh to take the truck out of the little packaging, flip it over to be able to look at the underside with his eyes, and then look through the slits or vents on the bottom of the truck to see the packaging."  Tr. at 104:21-25 (Mysliwiec).  See Tr. at 110:23-111:2 (Mysliwiec)("[I]f . . . Agent Walsh needed to go into the battery compartment to see the . . . pound of methamphetamine . . . we might have a different story.").  After all, Villaba conceded during oral argument, before the United States got up to argue, that Walsh had probable cause when he looked inside the hole and saw the package.  See Tr. at 98:8-13 (Crow)("Your Honor, . . . he doesn't have probable cause until he looks inside the hole. . . .  I think he said he had to look inside those little slits.  He never had probable cause to look inside those little slits.").  The Court thus need not and will not decide whether Villaba's consent was broad enough to extend further than a visual examination of the truck's underside and inside the slits on the bottom of the truck.  The Court observes, however, that both the Supreme Court and the Tenth Circuit have recognized that, while consent is not unlimited, when it is reasonable under the circumstances to believe that a suspect's consent to search a particular area included the suspect's consent to search a particular container within that area, the search of the contents of the particular container does not exceed the suspect's consent.  See, e.g., United States v. Jackson, 381 F.3d at 988 ("The search of a container does not exceed the scope of consent when, under the circumstances of the particular case, it was objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to open the container.").  Said differently, "absent an objection by the suspect, an officer does not exceed the scope of a suspect's consent 'if his consent would reasonably be understood to extend to a particular container.'"  United States v. Marquez, 337 F.3d at 1207 (quoting Florida v. Jimeno, 500 U.S. at 249).  Accordingly, under the applicable law, it might be that the consent to hold and examine the toy truck included Walsh's ability to examine any compartments inside the truck, including the battery compartment and the compartment which held the drugs.

At the evidentiary hearing, the United States argued that, even if Villaba's consent was limited to Walsh removing the toy truck from its packaging, and did not extend to Walsh's examination of the toy truck, by the time Walsh removed the truck from the packaging, he had developed sufficient reasonable suspicion to detain the truck, and flip the truck over to investigate the cause of his suspicion.  See Tr. at 104:19-105:1 (Mysliwiec).  Villaba contended that Walsh's reasonable suspicion was based on nervousness and tattered packaging, which circumstances are as consistent with lawful activity as criminal activity, and, thus, Walsh did not have sufficient reasonable suspicion to examine the toy truck's underside.  The Court agrees with the United States that, under the totality of the circumstances, Walsh had developed reasonable suspicion sufficient to examine the truck's underside and that his detention and examination of the toy truck to investigate his reasonable suspicion was thus lawful.

An officer may detain a person's luggage or effects, briefly, and examine the luggage, on less than probable cause, when a law enforcement officer's observations provide the officer reasonable belief that a person's luggage or effects contain narcotics.  See United States v. Place, 462 U.S. at 706 ("[W]hen an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of Terry . . . would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope.").[11]  Thus, "[l]aw enforcement

---

[11] The Tenth Circuit in United States v. King, 990 F.2d 1552 (10th Cir. 1997), noted: "Terry was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person . . . [other than] arrests,' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  990 F.2d at 1557 (internal citations omitted)(quoting Terry v. Ohio, 392 U.S. at 16, 27).  Thus, Terry v. Ohio

has come to stand for two distinct propositions -- an investigative detention

officers may seize and briefly detain a traveler's luggage provided that the officers have reasonable articulable suspicion that the luggage contains narcotics." United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992)(citing United States v. Place, 462 U.S. at 706; United States v. Scales, 903 F.2d 765, 768 (10th Cir. 1990)). See United States v. Canto, 405 F.3d 1173, 1179 (10th Cir. 2005)("[S]eizure of property based on reasonable suspicion does not violate the Fourth Amendment, 'provided that the investigative detention is properly limited in scope.'")(quoting United States v. Place, 462 U.S. at 706). "The same degree or quantum of reasonable suspicion is required to detain a person as is required to detain a person's luggage." United States v. Hall, 978 F.2d at 620-21 (citing United States v. Nurse, 916 F.2d 20, 24 (D.C. Cir. 1990)).

The Tenth Circuit has pointed out that "[t]he concept of reasonable suspicion is not readily reduced to a neat set of legal rules." United States v. Hall, 978 F.2d at 620 (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)). "Rather, the totality of the circumstances must be taken into account, and based upon those circumstances, the seizing officers must have a 'minimal level of objective justification' which the officers can articulate; an 'inchoate and unparticularized suspicion or hunch' is insufficient." United States v. Hall, 978 F.2d at 620 (quoting United States v. Bloom, 975 F.2d 1447, 1456 (10th Cir. 1992)). See United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007)("When evaluating the existence of reasonable suspicion, we look to the 'totality of circumstances' to see whether the detaining officer had a 'particularized and objective basis for suspecting legal wrongdoing.'")(quoting United States v.

---

("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557 (internal citations omitted)(citing United States v. Sokolow, 490 U.S. at 7; Adams v. Williams, 407 U.S. 143, 147-48 (1972)).

Arvizu, 534 U.S. 266, 273 (2002)), overruled in part on other ground by Davis v. Washington, 547 U.S. 813 (2006).  The Court has pointed out that "[r]easonable suspicion does 'not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'"   United States v. Hernandez-Lopez, 761 F. Supp. 2d 1172, 1185 (D.N.M. 2010)(Browning, J.)(quoting United States v. Arvizu, 534 U.S. at 274).   The Tenth Circuit has held that, under the totality-of-the-circumstances test for reasonable suspicion, even behavior that is innocent by itself can, in totality, support reasonable suspicion:

> "Factors, which when taken separately may be perfectly innocent behavior, can support a finding of reasonable suspicion when taken together. Conversely, although the nature of the totality of the circumstances makes it possible for individually innocuous factors to add up to reasonable suspicion, it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation. In analyzing the factors that may amount to reasonable suspicion, we must be careful to judge the officer's conduct in light of common sense and ordinary human experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances."

United States v. Ramirez, 479 F.3d at 1244 (quoting United States v. Wallace, 429 F.3d 969, 975-76 (10th Cir. 2005)).

In United States v. Place, the Supreme Court agreed with the United States that, "where the authorities possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics, the governmental interest in seizing the luggage briefly to pursue further investigation is substantial."   United States v. Place, 462 U.S. at 703.   The Supreme Court reasoned, however, that under Terry v. Ohio, courts must weight "[a]gainst this strong governmental interest" the "nature and extent of the intrusion upon the individual's Fourth Amendment rights when the police briefly detain luggage for limited investigative purposes." 462 U.S. at 705.   The Supreme Court discussed its reasoning for finding Terry v. Ohio's

framework, which originally applied to detention of persons, applicable to the detention of personal property, and which it concluded is equally applicable to constrain the length of seizures of personal property:

> The intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent. The seizure may be made after the owner has relinquished control of the property to a third party or, as here, from the immediate custody and control of the owner. Moreover, the police may confine their investigation to an on-the-spot inquiry -- for example, immediate exposure of the luggage to a trained narcotics detection dog -- or transport the property to another location. Given the fact that seizures of property can vary in intrusiveness, some brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime.

United States v. Place, 462 U.S. at 705-706 (internal footnotes omitted).  Nevertheless, the Supreme Court held that, because the seizure -- initially permissible based on reasonable suspicion -- lasted ninety-minutes, the length of the detention was unreasonable in relation to the level of justification for the seizure, and was therefore unlawful.  See 462 U.S. at 710.

Because Villaba concedes that he consented to Walsh's requests for consent during the encounter up to the point in time at which Walsh turned over the toy truck to investigate the truck's underside, it is the circumstances up to that point that the United States must show support reasonable suspicion that the truck contained contraband.  The parties first and foremost dispute whether Walsh's observation that Villaba appeared nervous can play into the reasonable-suspicion calculus.

The Tenth Circuit in United States v. Hall held that the facts in that case did not support reasonable suspicion and noted "that Defendant appeared nervous after the officers identified themselves is of little significance, because, as in Bloom, neither officer had any prior contact with Defendant with which to compare her behavior, thereby making Defendant's nervous

appearance to the officers merely a hunch." 978 F.2d at 621. Indeed, in a footnote, the Tenth

Circuit cautioned courts as to reliance on nervousness in determining whether an officer has

reasonable suspicion:

> "In all search and seizure cases of the type here concerned, the government argues
> that a defendant's nervousness, either alone or in conjunction with other factors,
> supports the contested search or seizure. This repetitive assertion by the
> Government in all cases of this kind must be treated with caution. It is common
> knowledge that most citizens[,] whether innocent or guilty, when confronted by a
> law enforcement officer who asks them potentially incriminating questions are
> likely to exhibit some signs of nervousness."

978 F.2d at 621 n.4 (original alterations omitted)(quoting United States v. Millan-Diaz, 975 F.2d

720, 722 (10th Cir. 1992)). Together, United States v. Hall and United States v. Bloom have

come to stand for the proposition that, to take into account a suspect's nervousness in any

encounter with a law enforcement officer, the officer must have some opportunity from which to

determine a baseline behavior, with which the officer can compare the suspect's later

nervousness. See, e.g., United States v. Ramirez, 479 F.3d at 1244 (distinguishing the officer's

observation of the defendant's nervousness from United States v. Hall by pointing out that the

officer "was participating in the ongoing investigation of Mr. Ramirez for drug trafficking," and

that, on the day the officer arrested Ramirez, "Agent Burnett noticed that Mr. Ramirez seemed

'very nervous' and 'evasive,' a manner of behavior that was 'distinct[ly] differen[t]' than in

previous police encounters"); United States v. Valles, 292 F.3d 678, 681 (10th Cir.

2002)(distinguishing United States v. Hall and taking into the Tenth Circuit's reasonable

suspicion analysis the suspect's nervousness, because the officer "had the opportunity to observe

[the defendant]'s demeanor before [the officer] directed the conversation to [the suspect]'s bags,

thereby giving [the officer] a baseline behavior to which he could compare [the defendant]'s later

extreme nervousness").

- 63 -

Here, Walsh quickly pointed out that Villaba appeared nervous, and thus did not have an opportunity to develop a baseline behavior for Villaba, on which the Court may consider Villaba's later nervousness in its analysis whether Walsh had reasonable suspicion that the toy truck contained contraband.  First, unlike the encounter between the agent who was involved in an ongoing investigation with the defendant in United States v. Ramirez, this encounter was Walsh's first with Villaba.  Second, there is no evidence that Villaba's nervousness decreased or increased during the consensual encounter with Walsh.  The Tenth Circuit noted in United States v. Valles that the officer, Small, "testified that Valles began their encounter in a very easy going manner, but 'when I got to the pointed question about the luggage, he couldn't quite complete his sentences.'"  292 F.3d at 679.  In this case, on the other hand, Walsh asked Villaba why he appeared nervous less than a minute and thirty seconds after first approaching Villaba.  See Bus Station DVD at 10:19:44-21:03 (Walsh).  Moreover, when asked about Villaba's demeanor "while this conversation was going on," Walsh replied that Villaba was "extremely nervous," but, importantly, did not indicate that Villaba had become more nervous at any time during the encounter. Tr. at 29:16-22 (Mysliwiec, Walsh)(Q.  "[I]t sounds like originally he didn't want to consent to a search but then he voluntarily showed you what was inside.  What was his demeanor like while this conversation was going on?"  "A.  He was extremely nervous, very nervous.  I could -- I could hear his voice shuttering; his hands were shaking, his eyes were [darting] from side to side.").  The Court therefore concludes that Villaba's nervousness does not support that Walsh developed reasonable, articulable suspicion that Villaba's toy truck contained contraband.

Similarly, that Villaba originally refused consent to any of Walsh's requests cannot form the basis of reasonable suspicion.  See United States v. Santos, 403 F.3d 1120, 1126 (10th Cir. 2005)("If refusal of consent were a basis for reasonable suspicion, nothing would be left of

Fourth Amendment protections.").  The same prohibition on a basis for reasonable suspicion extends to Villaba's equivocation in granting his consent: "However suspicious the tailoring of consent may be as a matter of common sense, it cannot be a basis for 'reasonable suspicion' under the Fourth Amendment, lest the very idea of voluntary consent be rendered fictional. United States v. Santos, 403 F.3d at 1126.  Indeed, the Tenth Circuit has suggested that to rely on denial of consent for reasonable suspicion would be reversible error.  See United States v. Santos, 403 F.3d at 1126 ("If the district court had relied on Mr. Santos's refusal to consent in its order denying the motion to suppress, that would be reversible error.")(citing United States v. Williams, 271 F.3d 1262, 1271 (10th Cir. 2001)).

Nevertheless, the Court concludes that the totality of the circumstances, without taking into consideration Villaba's nervousness or his equivocation in giving consent, support that Walsh developed reasonable suspicion that the toy truck contained contraband before he flipped the truck to examine its underside. The Court has identified at least eight factors that, while "taken separately may be perfectly innocent behavior," "support a finding of reasonable suspicion when taken together."  United States v. Ramirez, 479 F.3d at 1244.  First, Villaba was traveling to Albuquerque from Phoenix, which Walsh testified, from his training and experience, he knew "is a large source city for illegal narcotics."  Tr. at 10:20-21 (Walsh).  Second, Villaba told Walsh and Perry that he had stayed with a friend in Phoenix for "[l]ike four, five days," Walsh Conversation at 7:3 (Villaba), and that he traveled only with one small duffle bag, which contained a toy truck, and which contained "much less clothing" than what he believed was sufficient for a four or five day stay in Phoenix, Tr. at 23:1-4 (Walsh).  Third, the toy truck, which Villaba told the officers he had purchased new at Kmart in Phoenix, "took up the majority of the capacity of the interior of the bag."  Tr. at 12:21-22 (Walsh).  This third factor relates to

the rest of the factors, and especially to the second factor, because it is suspicious that a person traveling to Phoenix to visit a friend for four or five days would return with only a small bag, in which a toy purchased from a store that has three locations in the greater Albuquerque area takes up the majority of the bag's capacity.   Fourth, the toy truck itself raised Walsh's suspicion, because, in cases in which Walsh had been involved, as well as in cases in which he had not been involved, but in which other DEA agents had been involved, Walsh knew that officers many times "encounter narcotics that are concealed in a wide variety of items, to include toys."  Tr. at 13:13-17 (Walsh).  See Tr. 13:24-14:1 (Mysliwiec, Walsh)(Walsh testifying that the child's toy was suspicious to him).   Fifth, given that Villaba had told the officers that he purchased the toy new, the tattered packaging raised Walsh's suspicions.  See Tr. at 14:22-25 (Walsh)("As I was looking at the packaging I could see that it was worn on the corners, it had been retaped, and it appear[ed] as though the cardboard packaging surrounding the truck on two separate sides had been tampered with.").   Sixth, that Villaba told Perry he purchased the toy new for $10.00.  See Bus Station DVD at 10:25:25-25:37 (Perry, Villaba). As Perry pointed out by asking whether he purchased the toy on sale, the toy truck, with working sirens, batteries included, and the included trailer, does not appear to be a toy that sells for $10.00.  Seventh, Walsh's suspicions were raised when, after he removed the toy truck from the duffle bag, but before he removed the truck from its packaging, he observed signs of tampering with the zip ties that held that truck to the cardboard packaging.  See Tr. at 23:12-18 (Walsh); id. at 24:7-25:9 (Mysliwiec, Walsh).  With regard to this seventh factor, while, as Villaba points out in his Reply, it is possible that the cardboard packaging could have become tattered because of children in Kmart, or because Villaba damaged the packaging when placing the toy inside of the duffle bag, it is unlikely that this activity would have damaged the zip ties or the holes through which the zip ties that hold the

truck to the packaging are inserted.  Additionally, Walsh testified that it was only the zip ties to the truck itself, and not to the additional trailer inside the packaging, that appeared to have endured tampering.  <u>See</u> Tr. at 25:18-26:12 (Walsh).  Eighth, Walsh's observation that the toy truck "was unusually heavy, moreso than [what he believed a layperson would expect] a normal toy truck" to weigh, raised Walsh suspicion.  Tr. at 15:3-5 (Walsh).  Although Walsh conceded at the evidentiary hearing that he did not know how many batteries the toy truck required, and that he had never held that model of toy truck before the incident, the Court finds Walsh's assertion credible that a toy truck which contained about a pound of methamphetamine unusually heavy; there is a tangible difference between the weight of six AA batteries and a pound.  In totality, taken together, these eight factors, which all occurred before Walsh flipped over the toy truck after taking it out of its cardboard packaging, provided Walsh articulable, reasonable suspicion that the toy truck contained illegal narcotics.  Walsh could therefore detain the toy truck "briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope."  <u>United States v. Place</u>, 462 U.S. at 706.

The Court further concludes that the time that Walsh detained the toy truck after removing it from the packaging to investigate the circumstances that aroused his suspicion -- whether it contained narcotics -- was properly limited in scope, was reasonable, and was therefore constitutional.  The further detention -- beyond the time that Walsh removed the truck from its packaging, to which Villaba concedes he consented -- for the time from which Walsh flipped over the truck, until Walsh saw the bag inside the toy truck and arrested Villaba, although somewhat difficult to discern from the recording, appears to be approximately just under one

minute.[12]   See Bus Station DVD at 10:25:16-26:13.  The Court therefore concludes that Walsh's

detention of the toy truck to investigate his reasonable suspicion that it contained illegal narcotics

-- i.e., his visual examination of the outside of the truck, was reasonable and, therefore, did not

violate Villaba's Fourth Amendment rights.

IV.    **BECAUSE WALSH SAW THE PACKAGE CONTAINING THE DRUGS IN PLAIN VIEW DURING HIS VISUAL EXAMINATION OF THE TOY TRUCK, THE SEARCH DID NOT VIOLATE VILLABA'S FOURTH AMENDMENT RIGHTS.**

Villaba contends that the United States' argument that Walsh's discovery of the drugs

falls under the plain-view exception to the Fourth Amendment's warrant requirement would be

equivalent to "expand[ing] the plain view exception to permit a warrantless search of any

container found in the vicinity of a suspicious item."  Reply at 6.  At the evidentiary hearing,

Villaba contended that Walsh's use of the flashlight violated the plain-view exception.  The

Court asked: "If [Walsh] had to use the flashlight to look into the holes, is that plain view?"  Tr.

at 100:11-12 (Court).  Villaba responded: "No, Your Honor, because you are looking into the

actual container."  Tr. at 100:13-16 (Crow).  The Court concludes, however, that, because the

Tenth Circuit has established that an officer may, under the plain-view doctrine, look into a car's

---

[12] Because of Walsh's position in relation to the camera, with his back to the camera and the toy truck mostly out of the camera's view, it is difficult to discern at what point Walsh dislodges the truck from its packaging.  Villaba grants Walsh consent to take the truck out of the packaging just after 10:23.  For the next few moments, Walsh is continuously struggling with the toy on the ledge.  At approximately 10:25:16, it appears that Walsh ceases struggling with the package momentarily. It also appears that Walsh removes the toy from the packaging.  Based on these two appearances, the Court concludes that the point is when Walsh removed the toy from the packaging, and determines it approximately the time at which Walsh flipped over the truck to examine the truck's underside.   Regardless whether the Court is correct in its observations, because Villaba grants Walsh consent at approximately 10:23:01, and Walsh arrests Villaba just over three minutes later, at 10:26:13, three minutes is not an unreasonable time to detain the toy truck to investigate Walsh's reasonable suspicion that it contains narcotics.  Thus, even if the Court's timing is not precise, this lack of precision does not affect the Court's conclusion that the detention was reasonable and constitutional.

window assisted by a flashlight, and because Walsh's visual examination was lawful either by Villaba's consent or by Walsh's reasonable suspicion, his view into the inside of the truck using his flashlight during his visual examination of the outside of the toy truck did not violate Villaba's Fourth Amendment rights.

The Tenth Circuit has held that "a visual inspection of that which is in plain view does not constitute a search." United States v. Nicholson, 144 F.3d 632, 636 (10th Cir. 1998 (citing Arizona v. Hicks, 480 U.S. at 328).  The Tenth Circuit has also noted that "incriminating evidence that may be seen through the window of a vehicle may be in plain view," and that "[t]his view may be assisted by a flashlight without any infringement of Fourth Amendment rights."  United States v. Green, 140 F. App'x 798, 800 (10th Cir. 2005)(unpublished)(citing United States v. Sparks, 291 F.3d 683, 692 (10th Cir. 2002); Texas v. Brown, 460 U.S. at 739-40; United States v. Ortiz, 63 F.3d 952, 954 (10th Cir. 1995)).  See Texas v. Brown, 460 U.S. at 740 ("[T]he use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.").  Nevertheless, this evidence is still subject to the plain-view exception's three requirements: "(i) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (ii) the item's incriminating character is immediately apparent; and (iii) the officer has a lawful right of access to the object itself."  United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139.

Walsh's examination of the truck's underside, including his discovery, with his flashlight's aid, of the bag containing the methamphetamine through the slits in the truck's underside falls under the plain-view doctrine.  First, the Court concludes that Walsh's visual examination of the truck's underside did not violate Villaba's Fourth Amendment rights, because Villaba consented to the visual examination and Walsh also had reasonable suspicion to examine

the truck in that manner.   Second, based on Walsh's reasonable suspicion that the truck contained narcotics, and his experience with narcotics in toys and in baggies, the incriminating character of the taped bag that he saw inside of the slits on the toy truck's underside was immediately apparent.   Third, given either Villaba's consent or Walsh's suspicion, "the officer had a lawful right of access to the object itself."   United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139.   Although Walsh used a flashlight to see the bag inside the truck, given the Supreme Court's guidance that "the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection," Texas v. Brown, 460 U.S. at 740, the flashlight does not affect the constitutionality of Walsh's otherwise lawful search.   Thus, once Walsh viewed the packaging, the incriminating nature of which was immediately apparent, in plain view from where he had a lawful right to be, Walsh had the lawful ability to seize the evidence.   See United States v. Castorena-Jaime, 285 F.3d 916, 925 (10th Cir. 2002)("[O]fficers may seize evidence in 'plain view' without a warrant.")(holding that the plain view exception applied to an officer's seizure of a taped baggie, where the officer saw a taped baggie container about which he "testified he has not seen a similarly taped bundle of this size that did not contain either drugs or drug trafficking proceeds," and holding that the officer's "inability to see through the opaque tape around the bundle is 'all but irrelevant: the distinctive character of the container itself spoke volumes as to its contents -- particularly to the trained eye of the officer'")(quoting Texas v. Brown, 460 U.S. at 743).   The Court therefore concludes that Walsh's search of the toy truck and seizure of the narcotics did not violate Villaba's Fourth Amendment rights.   Accordingly, the Court will not exclude the drug evidence in this case from trial.

**IT IS ORDERED** that the Defendant's Motion to Suppress, filed June 11, 2013 (Doc.

24), is denied.  The Court will therefore not exclude from trial the drug evidence that officers

found in Defendant Jose Israel Villaba's possession.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Paul Mysliwiec
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for the Defendant*